**C.F. TRUST, INC., et al., Plaintiffs,**

v.

**FIRST FLIGHT LIMITED PARTNERSHIP, et al., Defendants.**

No. Civ.A. 99–1742–A.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 31, 2000.

---

Thomas Lawrence Albert, Birch, Horton, Bittner & Cherot, Washington, DC, James Robert Schroll, Bean, Kinney & Korman, PC, Arlington, VA, for plaintiffs.

Russell James Gaspar, Cohen Mohr LLP, Washington, DC, James Thomas Bacon, Allred, Bacon, Halfhill, Landau & Young, PC, Fairfax, VA, Robert Jay Zelnick, Szabo, Zelnick & Erickson, P.C., Woodbridge, VA, Kerr Stewart Evans, Jr., Pepper Hamilton LLP, Washington, DC, for defendants.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

This action arises out of attempts by the plaintiffs to collect on judgments they hold against defendant Barrie Peterson. Plaintiffs, C.F. Trust, Inc. ("CF Trust") and Atlantic Funding Corporation ("AFC"), have brought suit alleging that defendant Barrie Peterson has used various corporations, partnerships, and individuals as alter egos to avoid payment of his obligations under the judgments and seeking to pierce the corporate veil in *reverse* to reach the assets of these entities. At bar are the parties' cross motions for summary judgment, presenting, *inter alia*, the question whether Virginia law recognizes a cause of action for reverse piercing of the corporate veil, and if so, what standards govern such an action.

### I

Plaintiffs, CF Trust, a Florida corporation with its principal place of business in Florida, and AFC, a Nevada corporation with its principal place of business in Florida, each own commercial notes on which defendant Barrie Peterson, individually, Barrie Peterson as a trustee, and Nancy

Peterson,[1] are liable as endorsers and guarantors.[2] On the basis of its notes, CF Trust has a judgment against these parties jointly and severally in the amount of $6.1 million plus nine percent interest per annum, which judgment was initially entered in Prince William County Circuit Court on February 1, 1996 and later removed to this court. On its note, AFC also has a judgment against Barrie Peterson, individually and as trustee, in the amount of $1.2 million plus interest, entered by this Court on November 5, 1991.[3] In addition to these judgments, plaintiffs each hold charging orders issued by both this Court and the Prince William County Circuit Court charging the partnership interests of the parties with payment of the judgments. Plaintiffs have brought the instant suit to declare that the defendants in this suit, Maryland Air Industries, First Flight Limited Partnership ("First Flight"), Birchwood Holding Group ("BHG"), Birch-

wood Organizations, Inc. ("BOI"), Nancy Peterson and Scott Peterson—various corporations, partnerships, and individuals plaintiffs allege Barrie Peterson owns or substantially controls—are his alter egos, and that through these entities, he has hindered and evaded the collections of these lawful judgments.

This case is by no means the first suit by the plaintiffs claiming that Barrie Peterson has taken steps to evade the payment of these judgments and to defraud his creditors. To the contrary, this case is merely the latest chapter in an ongoing saga. So voluminous is the litigation involving these parties that only a summary is presented in the margin.[4]

In the instant suit, filed in November 1999, plaintiffs initially stated claims for: (i) a declaratory judgment that First Flight, BHG, BOI, PVD Limited Partner-

1. Nancy Peterson, the wife of Barrie Peterson, is liable only on the CF Trust notes.

2. Plaintiffs are purchasers, not original holders of the commercial notes. They brought this suit as co-plaintiffs because the sole shareholder of AFC is both the vice-president of CF Trust and the sole owner of a corporation that is a 25% shareholder of CF Trust.

3. The commercial notes owned by CF Trust are in the original principal amount of $6,064,903.57. The promissory note owned by AFC is in the total original principal amount of $1 million.

4. See C.F. Trust v. Peterson, Civil Action No. 96–1128–A (E.D Va. Dec. 9, 1996) (voiding as a fraudulent conveyance a deed of trust Barrie and Nancy Peterson placed on their residence); C.F. Trust, Inc. v. DEP, Inc., Adversary Proceeding No. 97–1017 (Bankr.E.D.Va. Oct. 31, 1997), aff'd sub nom. J.P. Development, Inc. v. C.F. Trust, Inc., Civil Action No. 98–0079 (E.D.Va. April 3, 1999), aff'd sub nom. C.F. Trust, Inc. v. J.P. Development, Inc., Case No. 98–1670, 1999 WL 114485 (4th Cir. March 5, 1999) (finding J.P. Development, a corporation wholly owned and controlled by Scott Peterson, to be Barrie Peterson's alter ego); C.F. Trust, Inc. v. Peterson, Civil Action No. 97–2003–A (E.D.Va. Jan. 8, 1999), appeal pending sub nom. C.F. Trust, Inc. v. Jubal, Inc., Case Nos. 99–1197, 99–

1198, 99–1199 (consolidated) (4th Cir.1999) (finding (a) that Maryland Air Industries and Maryland Air International were the alter egos of both Barrie and Scott Peterson, (b) that Scott Peterson used shell corporations to create appearance of encumbrances to frustrate legitimate creditors, and (c) that transfer of property to Scott Peterson was void as a fraudulent conveyance); Peterson v. Cooley, 142 F.3d 181 (4th Cir.1998) (upholding the actions of CF Trust in acquiring notes and judgments against defendants); DEP, Inc. v. Jacques, Adversary Proceeding No. 97–1049 (Bankr.E.D.Va. Sept. 16, 1997) (declaring that CF Trust had a lawful first deed of trust encumbering two DEP properties); Peterson v. Atlantic Funding Corp., Civil Action No. 96–531–A (E.D.Va.1996) (dismissing Barrie Peterson's claim that AFC judgment was not enforceable against him); DEP, Inc. v. Atlantic Funding Corp., Adversary Proceeding, No. 96–1167–SSM (Bankr.E.D.Va.1996); Peterson v. Atlantic Funding Corp., Civil Action No. 96–1476–A (E.D.Va.1996) (granting summary judgment in favor of Atlantic Funding); Peterson v. Cooley, Chancery No. 41122 (Circ.Ct. Prince William Cty., Va.) (suit by Barrie Peterson against AFC and one of its officers alleging tortious interference and conspiracy in connection with acquisition of the Note and Judgment); Atlantic Funding Corp. v. Peterson, Civil Action No. 91–1084 (E.D.Va. 1991) (finding of contempt against Barrie Peterson for failure to produce stock certificates).

ship, Maryland Air Industries, Occoquan Limited Partnership, Scott Peterson, Nancy Peterson, and other entities owned by Barrie or Scott Peterson are Barrie Peterson's alter egos; (ii) an injunction against asset transfers; (iii) an appointment of a receiver; (iv) violations of charging orders; (v) violation of a garnishment order; (vi) a declaratory judgment that the Carnett charging order issued against Barrie Peterson is extinguished; (vii) conspiracy to injure plaintiffs in their trade or business in violation of Va.Code § 18.2–499 & 500; (viii) common law conspiracy; (ix) RICO violations; and (x) costs and attorneys' fees. Many of the parties and claims have been dismissed either by order of this Court or voluntarily by the parties. At this time, the only remaining claims are Counts I (a declaratory judgment that First Flight, BHG, BOI, Maryland Air Industries, Nancy Peterson, Scott Peterson, and other entities owned by Barrie or Scott Peterson are Barrie Peterson's alter egos), II (an injunction against asset transfers), and III (an appointment of a receiver).[5] The only remaining parties are Barrie Peterson, Scott Peterson, Nancy Peterson, First Flight Limited Partnership, and Maryland Air Industries.[6]

At all relevant times, Barrie Peterson, a Virginia citizen, wholly owned and controlled defendants BHG, BOI, and Maryland Air Industries and is a 49% limited partner, along with his son Scott Peterson, in defendant First Flight.[7] First Flight is a limited partnership organized under the laws of Virginia with its principal place of business in Woodbridge, Virginia. The general partner of First Flight is a corporation wholly owned by defendant Scott Peterson, the Upland Group. BHG[8] and BOI[9] are both corporations organized under the laws of Virginia with their principal place of business in Woodbridge, Virginia. Maryland Air Industries is a corporation organized under the laws of Virginia with its principal place of business in Woodbridge, Virginia.

Plaintiffs allege that, during and after the initial judgment was entered, defendants engaged in numerous transactions among themselves, and transferred funds among themselves, for the purpose of avoiding Barrie Peterson's obligations to plaintiffs. Plaintiffs also allege that Barrie and Scott Peterson conduct business

---

**5.** By Order dated March 31, 2000, this Court dismissed the RICO count. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership.*, Order, C.A. No. 99–1742–A (March 31, 2000). Furthermore, on June 23, 2000, this Court accepted plaintiffs' motion to dismiss voluntarily Counts IV, VI, VII, VIII, and X, and defendants Occoquan and Carnett pursuant to Rule 41(a)(2), Fed.R.Civ.P. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership.*, Order, C.A. No. 99–1742–A (June 23, 2000). According to the parties' memoranda, plaintiffs accepted a $15,000 offer of judgment from Birchwood Holdings Group on Count V of the complaint (violation of a garnishment order).

**6.** By Order dated March 31, 2000, this Court dismissed PVD Limited Partnership, a Florida corporation, in order to maintain diversity jurisdiction. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership.*, Order, C.A. No. 99–1742–A (March 31, 2000). Furthermore, by Order dated August 25, 2000, this Court dismissed BHG and BOI for lack of controversy. *See C.F. Trust, Inc. v. First Flight Ltd. Partner-*

*ship.*, Order, C.A. No. 99–1742–A (August 25, 2000).

**7.** By Order dated June 19, 2000, plaintiff AFC became the sole owner of the stock of BHG and BOI. *See Atlantic Funding Corp. v. Peterson*, Order, C.A. No. 91–1084–A (June 19, 2000). AFC bought the stock at auction pursuant to a judicial sale order. As a result, defendant Barrie Peterson has lost ownership and control of these entities. Because of this loss of control, defendants moved for partial summary judgment on behalf of BHG and BOI due to a lack of controversy remaining between the plaintiffs and these parties.

**8.** BHG provides administrative and management services, primarily, to other Barrie Peterson controlled entities. BHG derives revenue from fees charged for these services at the rate of cost plus ten percent.

**9.** BOI provides lease and property management services almost exclusively to the First Flight. BOI charges a four percent fee for this service.

through First Flight, Maryland Air Industries, and other entities that Barrie or Scott Peterson own and use for Barrie and Nancy Peterson's personal benefit, and that Barrie Peterson uses these entities as his alter ego. For instance, plaintiffs argue that First Flight, in violation of the First Flight partnership agreement, transferred over four million dollars to Scott Peterson. Plaintiffs argue that the general partner, the Upland Group, did not authorize the distribution and that, under the partnership agreement, distributions are to be made to limited partners on a pro-rata basis. Accordingly, plaintiffs argue that approximately half of this amount should have been paid to Barrie Peterson and thus subject to collection by plaintiffs as judgment-creditors. Further, plaintiffs allege (i) that Barrie Peterson caused money to be funneled from First Flight, BOI, and Maryland Air Industries to BHG above and beyond any reasonable fees charged for their services, (ii) that these payments were without any corporate or business purpose, and (iii) that these funds were used to pay the personal expenses of Barrie Peterson and his family.[10] Barrie and Scott Peterson's conduct of business through these entities, according to plaintiffs, is for the purposes of frustrating plaintiffs' attempts to collect their judgments, evading lawful executions processes, and deceiving government entities.

## II

On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). Sum-

mary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, in a case in which the nonmoving party bears the burden of proof at trial, as in this case, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56).

## III

The threshold question raised by the parties' cross-motions for summary judgment is whether Virginia law permits creditors to pierce the corporate veil in reverse—that is, whether a person with a claim against a corporate insider or limited partner can "attempt to have the insider and the corporate entity treated as a single person." Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J.Corp.L. 33, 36 (1990). Defendants assert that Virginia does not recognize reverse piercing of the corporate veil, and that even if it did, the plaintiffs have failed to establish that Bar-

---

10. For example, plaintiffs allege that BHG paid Barrie Peterson's personal mortgage obligation on a residence in Nantucket, his cred-

it card expenses, his health insurance, and his expenses at a country club.

rie Peterson has used the corporations, limited partnerships, and individuals as his alter egos.

### 1. *Virginia Law Permits Reverse Piercing of the Corporate Veil*

■ The "independent legal existence of the corporation is a basic component of corporate law." *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 114, 431 S.E.2d 318, 320–21 (1993). While Virginia law permits actions to disregard this separate legal existence, settled precedent cautions courts that piercing of the corporate veil should be permitted "only when necessary to promote justice" and only under exceptional circumstances. *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987); *see also Perpetual Real Estate Serv., Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 547–48 (4th Cir.1992). These circumstances exist where the corporate insider has so abused or disregarded the corporate form [11] that the corporation becomes the alter ego of the insider. In these instances, it is settled that if certain requirements are met, the corporate veil may be pierced so that the creditor can reach the assets of a shareholder to satisfy the obligations of the corporation. *See Cheatle*, 234 Va. at 212–13, 360 S.E.2d 828.

■ This case raises a variant of the traditional veil-piercing case. In a traditional veil-piercing action, a court disregards the existence of the corporate entity so a claimant can reach the assets of a corporate insider. In a reverse piercing action, however, the plaintiff seeks to reach the assets of a corporation to satisfy claims against a corporate insider. *See, e.g., In re Blatstein*, 192 F.3d 88, 100 (3d Cir.1999). This action, sometimes referred to as "outsider reverse piercing," [12] achieves goals similar to those served by traditional piercing actions—namely, to prevent abuses of corporate or partnership structures.

Although relatively new, reverse piercing actions have gradually gained acceptance throughout the country.[13] While the Supreme Court of Virginia has not yet addressed this issue. Virginia may be said, nonetheless, to have joined this movement given that the Virginia Court of Appeals has recognized the outsider reverse piercing cause of action. *See Fox v. Fox*, 1998 WL 114010 (Va.App.1998); *McLeskey v. Davis Boat Works, Inc.*, No. 99–1113, 2000 WL 1008793 (4th Cir. July 21, 2000). In *Fox*, a husband, seeking to avoid his obligations under a divorce decree, was

---

**11.** Although discussion of the alter ego doctrine typically focuses on the corporate form, it is settled that the doctrine also applies to limited partnerships. *See, e.g., Sloan v. Thornton*, 249 Va. 492, 457 S.E.2d 60 (1995); *Fox v. Fox*, 1998 WL 114010 (Va.App.1998); *Freezer v. Miller*, 163 Va. 180, 199, 182 S.E. 250 (1934). Nor is defendants' contention to the contrary persuasive, as the limited partnership merely creates a veil capable of being pierced under appropriate circumstances.

**12.** Outsider reverse piercing actions must be distinguished from "insider reverse piercing" actions which are not the subject matter of the instant suit. In an insider reverse piercing claim, a dominant shareholder attempts to disregard the corporate form so as to permit the insider to raise corporate claims against the third party. *See Cargill v. Hedge*, 375 N.W.2d 477 (Minn.1985); Crespi, *The Reverse Pierce Doctrine, Applying Appropriate Standards*, 16 J.Corp.L. 33, 37 (1990). Be-

cause the plaintiffs in this case are outside creditors attempting to pierce the corporate veil in reverse, the body of law related to insider piercing cases is inapposite.

**13.** *See, e.g., United States v. Scherping*, 187 F.3d 796 (8th Cir.1999); *McCall Stock Farms, Inc. v. United States*, 14 F.3d 1562 (Fed.Cir. 1993); *FMC Fin. Corp. v. Murphree*, 632 F.2d 413 (5th Cir.1980); *Valley Fin., Inc. v. United States*, 629 F.2d 162 (D.C.Cir.1980); *Olympic Capital Corp. v. Newman*, 276 F.Supp. 646 (C.D.Cal.1967); *Shamrock Oil & Gas Co. v. Ethridge*, 159 F.Supp. 693 (D.Colo.1958); *Zisblatt v. Zisblatt*, 693 S.W.2d 944 (Tex.App. 1985); *Central Nat. Bank & Trust Co. v. Wagener*, 183 N.W.2d 678 (Iowa 1971); *Divco–Wayne Sales Fin. Corp. v. Martin Vehicle Sales, Inc.*, 45 Ill.App.2d 192, 195 N.E.2d 287 (1963); *Platts, Inc. v. Platts*, 49 Wash.2d 203, 298 P.2d 1107 (1956); *Central Fibre Prods. Co. v. Lorenz*, 246 Iowa 384, 66 N.W.2d 30 (Iowa 1954).

held to have abused the legal form of his partnerships and corporations and treated them as his alter egos. *See id.* at *8.[14] On these facts, the Virginia Court of Appeals approved the piercing of the veil of "limited partnerships, trusts and corporations" so as to permit the spouse to reach the assets of each of these entities to satisfy the terms of a divorce decree. *Id.*

The conclusion that Virginia law recognizes reverse piercing is not based solely on the Court of Appeals decision in *Fox;*[15] it finds further firm support in principle. Simply put, the rationale for traditional piercing operates with equal force in support of reverse piercing. The fiction of the separate legal existence of a corporation is recognized for the purpose of encouraging and enabling economic growth. When this form is abused, courts, in appropriate circumstances, may disregard the fiction. And, in these circumstances, this should be so, on principle, whether the fiction is misused to shield the owner's assets from claims against the corporation or to shield the corporation's assets from claims against the owner. Were this not the case, an individual could abuse the corporate or limited partnership forms with impunity so as to evade personal obligations and to hinder the collection of valid judgments. Commentators agree that reverse piercing, like traditional piercing, does not impair the legitimate commercial use of the corporate fiction. *See, e.g.,* Stephen B. Presser, *Piercing the Corporate Veil* § 1.06 (1993); Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards,* 16 J.Corp.L. 33 (1990).[16] Accordingly, it is likely that the Supreme Court of Virginia would recognize a reverse piercing cause of action, provided that the plaintiff can establish the requisite grounds.[17]

## 2. The Standard to Pierce the Corporate Veil

The standard for piercing the corporate veil, either to reach the individual through the corporation or the reverse, has occasioned much litigation, perhaps because, as the Supreme Court of Virginia has stated, "no single rule or criterion ... can be applied to determine whether piercing the corporate veil is justified." *O'Hazza,* 246 Va. at 115, 431 S.E.2d 318. What is clear is that the veil-piercing determina-

14. In reaching this conclusion, the *Fox* court relied on established Virginia precedent elucidating the standard for the determination of the alter ego test. *See Fox,* 1998 WL at *7–8.

15. Worth noting is that plaintiffs contend that *Fox* is not the sole decision indicating that Virginia law recognizes reverse piercing; they also cite two Eastern District of Virginia Bankruptcy decisions to support their reverse piercing claim. *See In re Wilson,* 90 B.R. 208 (Bankr.E.D.Va.1988); *In re Richels,* 163 B.R. 760 (Bankr.E.D.Va.1994). *In re Wilson* is inapposite as it involves insider reverse piercing. *See supra* note 4. *In re Richels* is a more difficult case because it has characteristics of both insider *and* outsider piercing. The plaintiff, in that case, was both an insider—trustee standing in the shoes of the debtor—and an outsider—trustee acting as creditor. *See In re Richels,* 163 B.R. at 763–64. To the extent that the trustee was viewed as an outsider, akin to a creditor, this decision, then, along with *Fox,* provides precedential support for Virginia's allowance of *outsider* reverse piercing actions.

16. The only exception to this rule is that if a corporation has multiple shareholders, the prejudice to these other shareholders is greater under reverse piercing, because they, as non-culpable parties, will suffer for the actions of another shareholder. Because Barrie Peterson owns virtually all of the stock or partnership interests in these entities, this concern is not present in this case.

17. Plaintiffs actually assert that First Flight and Maryland Air Industries are the alter egos of BHG, its affiliate corporation, which, in turn, is the alter ego of Barrie Peterson. Virginia has long held that entities can be the alter egos of its subsidiaries *or* its affiliates. *See U.S. Fire Ins. Co. v. Allied Towing Corp.,* 966 F.2d 820 (4th Cir.1992); *In re Richels,* 163 B.R. 760 (Bankr.E.D.Va.1994); *Lewis Trucking Corp. v. Commonwealth,* 207 Va. 23, 31, 147 S.E.2d 747, 753–54 (1966) ("Where a corporation is so organized and controlled as to become the mere agent or instrumentality of another corporation, the courts have laid down the rule that the doctrine of corporate separateness may be ignored.").

tion is a fact-specific inquiry into the circumstances surrounding the corporation, the related parties, and the acts in question. It is also clear that piercing the corporate veil is justified when the "unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *Id.* It is not enough, however, that the plaintiff establish that the individual had control over the corporation or that "the corporate entity was [simply] the alter ego, alias, stooge, or dummy of the individuals sought to be charged personally." *Cheatle,* 234 Va. at 212, 360 S.E.2d 828; *see also Perpetual,* 974 F.2d at 548–49. In addition, the plaintiff must establish that the shareholder has "used the corporation to *evade a personal obligation,* to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage.... " *O'Hazza,* 246 Va. at 115, 431 S.E.2d 318 (emphasis added).

Defendants, however, argue for a different phrasing of the alter ego test, which they contend the plaintiffs cannot meet. Specifically, defendants contend that the phrase "evade personal obligations," included for the first time in the *O'Hazza* decision, is not a part of the alter ego standard. *O'Hazza,* they argue, was an aberration because a subsequent 1994 Supreme Court of Virginia decision did not include this language. *See RF & P Corp. v. Little,* 247 Va. 309, 440 S.E.2d 908 (1994). Defendants further contend that inclusion of the phrase "evade personal obligations" is inconsistent with the stringent alter ego standard set forth in *Perpetual,* which requires proof of a "legal wrong." 974 F.2d at 549. Relying upon this "legal wrong" requirement, they argue that plaintiffs cannot prevail, as the only counts relating to "legal wrongs"—namely conspiracy and violations of RICO, garnishment and charging orders—have been dismissed.

Defendants' argument fails for two reasons. First, in *Greenberg v. Common-*

*wealth,* the Supreme Court of Virginia in 1998 restated the *O'Hazza* formulation of the alter ego test, complete with the phrase "evade personal obligations." 255 Va. 594, 604, 499 S.E.2d 266, 272 (1998). Nor can it be said that the *O'Hazza* and *Greenberg* formulations are aberrations; in *Cheatle,* an oft-cited leading case on the piercing standard, the Supreme Court of Virginia used the phrase "avoid personal liability," which is essentially indistinguishable from the "O'Hazza–Greenberg" phrase. *Compare Cheatle,* 234 Va. at 213, 360 S.E.2d 828, *with O'Hazza,* 246 Va. at 115, 431 S.E.2d 318. Thus, defendants' reliance on the absence of the phrase in the *O'Hazza* decision is unpersuasive.

▪ Second, defendants misread *Perpetual.* The "legal wrong" requirement is correctly understood as a broad category that includes using the corporate form to (i) evade personal obligations, (ii) perpetuate fraud or a crime, or (iii) commit injustice. Thus, plaintiffs do not have to prove a legal wrong in the form of conspiracy or RICO violations in order to establish that the various entities are the alter egos of Barrie Peterson; instead, what is required is that the facts and circumstances establish one of the factors set forth in the *Cheatle–O'Hazza–Greenberg* line of cases. By showing that the transactions in question, which include alleged violations of charging or garnishment orders, were undertaken with a wrongful purpose or to evade creditors, plaintiffs may satisfy the "legal wrong" requirement in *Perpetual* and the factors in *Cheatle* and *O'Hazza.*

▪ Furthermore, relying on their mistaken view of the "legal wrong" requirement, defendants argue that dismissal of the majority of the counts from the complaint prohibits the plaintiffs from proving an alter ego claim because no underlying cause of action exists. This argument, too, fails. To be sure, the defendants are correct that the alter ego doctrine is not an independent cause of action, but rather is a "means for a complainant to reach a second corporation or

individual upon a cause of action that otherwise would have existed only against the first corporation."[18] Yet, this point is not dispositive here, as plaintiffs have underlying causes of action, namely actions to collect on plaintiffs' various judgments entered against Barrie Peterson.[19] Plaintiffs need not establish violations of RICO or the charging or garnishment orders in order to maintain a cause of action sufficient to have the various entities determined to be the alter egos of Barrie Peterson. Moreover, the underlying cause of action need not be found in the relationship between the insider and his alter ego. Thus, in *Shearson Lehman Hutton, Inc. v. Venners,* 165 F.3d 912 (4th Cir.1998) (unpublished), the Fourth Circuit, in an action based upon the Commodities Exchange Act, stated that the plaintiff could have pursued the alter ego in an enforcement proceeding following a judgment against the corporation. Similarly in *Greenberg,* the underlying cause of action was based on a violation of the Consumer Finance Act, not the actions by the corporate insider whose assets were sought through a traditional veil piercing action. *See Greenberg,* 255 Va. at 594, 499 S.E.2d 266. Accordingly, the dismissal of the various counts for RICO, conspiracy, and violation of the charging and garnishment orders does not preclude the plaintiffs from succeeding on their reverse piercing claim.

### 3. *Genuine Issues of Material Fact Exist*

█ Given the conclusion that plaintiffs may pursue their reverse piercing claim under Virginia law, the question that remains is whether either party is entitled to summary judgment based on the current record. More precisely, the question is whether the current record discloses any disputed material facts concerning whether the defendants abused the corporate and partnership forms so as to perpetrate

a fraud or crime, evade a personal obligation, or commit an injustice. A component of this is whether the transactions in question were undertaken with the purpose of hindering and defrauding Barrie Peterson's creditors in their attempt to collect on the judgments against him. A close review of the current record reflects that on this issue, material facts are indeed genuinely disputed, rendering summary judgment inappropriate. *See Perpetual,* 974 F.2d at 548–49 (determining the purpose of various transactions in connection with an alter ego allegation is a jury question).

While the occurrence of certain transactions is not in question, their purpose is. Thus, the parties agree that certain of Barrie Peterson's captive corporations made payments to cover his personal living expenses, but they sharply dispute whether Barrie Peterson directed these payments with the intent to defraud creditors or to evade a personal obligation. The parties also agree that BHG transferred funds to other Barrie Peterson-controlled entities. Plaintiffs allege, however, that these entities (First Flight, PVD Limited Partnership, Occoquan Limited Partnership) had no obligation or right to these funds and that these transfers were used to pay Barrie Peterson's personal living expenses. Yet another transaction in which the purpose is disputed is the distribution by First Flight of over $4.3 million to Scott Peterson between 1996 and 1999 and the subsequent transfer by Scott Peterson of $687,000 to BHG. While the parties agree that these distributions occurred, they disagree over whether these distributions were in violation of the First Flight Partnership Agreement and whether, therefore, approximately one-half of these funds should have been distributed to Barrie Peterson, in which event they may have been subject to plaintiffs' charging order on Barrie Peterson's interest in

---

18. *Fletcher Cyc. Corp.* § 41.10.

19. This issue may be revisited by the parties following hearing on the merits.

the partnership. Finally, the parties agree that between 1996 and 1999, First Flight, Maryland Air Industries, and BOI transferred large sums of money to BHG, of which some amount was in excess of the cost of the management services provided to these organizations. Plaintiffs argue that these transfers were made without a valid business purpose and to enable BHG to pay the personal expenses of Barrie Peterson while keeping his creditors from reaching these funds. Defendants counter by asserting that the allocation of these costs was reasonable and valid in these circumstances and that all transfers had a valid business purpose. These are all disputed issues of material fact. Accordingly, the cross motions for summary judgment must be denied.

### 4. Nancy and Scott Peterson Cannot Be the Alter Egos of Barrie Peterson.

The parties cite no case that authoritatively discusses whether the alter ego test is properly applicable to establish that an individual, not a corporation or partnership, is the alter ego of another individual. Nor is this surprising, for, on principle, it is clear that an individual cannot be the alter ego of another individual. The alter ego test was developed to provide creditors with a means of disregarding the corporate or limited partnership form when that legal fiction has been abused by corporate insiders. *See Cheatle*, 234 Va. at 212, 360 S.E.2d 828. In Virginia, the doctrine has only been employed to enable a court to disregard the separate legal identity of corporations or limited partnerships. *See, e.g., O'Hazza*, 246 Va. at 115, 431 S.E.2d 318 (referring only to corporation as alter ego of individual); *Cheatle*, 234 Va. at 212–13, 360 S.E.2d 828.[20] Plaintiffs' central argument is that it would be unfair to permit Barrie Peterson to use Nancy and Scott Peterson to avoid payment to his creditors. Even as-

suming, *arguendo,* the appeal of this broad, general argument, it does not change or modify the scope of the alter ego doctrine, which is limited to defining the circumstances under which the corporate or limited partnership forms may be disregarded.

This does not mean that plaintiffs were without a remedy for their concern over the roles that Nancy Peterson and Scott Peterson played in the alleged attempt to hinder the plaintiffs from collecting on the judgment. For example, plaintiffs might have asserted a conspiracy claim that Scott Peterson aided his father to avoid his legal obligations. However, these claims are not before the Court. Absent these claims, Scott and Nancy Peterson are not properly parties to this action.

### IV

For all the reasons stated above, defendants' joint motion for summary judgment is granted in part as to Nancy and Scott Peterson and denied in all other respects.

The Clerk is directed to forward this Memorandum Opinion to all counsel of record.

---

20. The only case purporting to find an individual to be an alter ego of another individual is the unreported decision of *In re Bohrer*, 1998 WL 228198 (4th Cir.1998 (Maryland)).

As this case did not involve Virginia law, but rather the federal bankruptcy code, its relevance to this matter is limited.