**C.F. TRUST, INCORPORATED; Atlantic Funding Corporation, Plaintiffs–Appellees,**

v.

**FIRST FLIGHT LIMITED PARTNERSHIP, Defendant–Appellant,**

and

**Birchwood Organization, Incorporated; Birchwood Holdings Group, Incorporated; Maryland Air Industries, Incorporated; PVD Limited Partnership; Occoquan Limited Partnership; Carnett Commercial Investors, Incorporated; Barrie M. Peterson; Barrie M. Peterson, Trustee; Nancy A. Peterson; Scott Peterson; Doe Entities 1–10, Defendants.**

No. 01–1753.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 2002.

Decided Aug. 20, 2002.

Amended Opinion Filed Sept. 23, 2002.

**ARGUED:** Russell James Gaspar, Cohen Mohr, L.L.P., Washington, D.C., for Appellant. Harvey Alan Levin, Birch, Horton, Bittner & Cherot, Washington, D.C., for Appellees. **ON BRIEF:** Barbara A. Miller, Birch, Horton, Bittner & Cherot, Washington, D.C.; James R. Schroll, Bean, Kinney & Korman, P.C., Arlington, Virginia, for Appellees.

Before WIDENER, WILLIAMS, and DIANA GRIBBON MOTZ, Circuit Judges.

Questions certified by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge WIDENER and Judge WILLIAMS joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge.

In this diversity action, First Flight Limited Partnership appeals from the district court's order declaring First Flight the alter ego of Barrie Peterson and, therefore, making its assets subject to judgments entered against Peterson in favor of C.F. Trust, Incorporated, and Atlantic Funding Corporation. Because we find Virginia law on the issues presented in this case uncertain, we respectfully certify two questions to the Supreme Court of Virginia.

### I.

C.F. Trust and Atlantic Funding each hold commercial promissory notes endorsed and guaranteed by Peterson.[1] As the district court noted, this case constitutes just one chapter in a prolonged tale involving C.F. Trust's and Atlantic Funding's efforts to collect a combined total of more than $8 million on their notes, and

---

1. Neither C.F. Trust nor Atlantic Funding originally held the notes. C.F. Trust was incorporated for the sole purpose of acquiring its two notes from their prior holder, Central Fidelity Bank. Atlantic Funding purchased its note from Resolution Trust Corporation. C.F. Trust and Atlantic Funding are related entities in that C.F. Trust's vice-president owns all shares of Atlantic Funding, as well as all shares of a corporation that owns 25% of C.F. Trust.

Peterson's equally determined efforts to avoid paying anything to them.

C.F. Trust, a Florida corporation, holds two notes, dated November 1, 1993, in the total principal amount of $6,064,903.57. Not only Barrie Peterson, individually and as trustee, but also his wife, Nancy Peterson, endorsed and guaranteed both notes. C.F. Trust formally notified the Petersons of their default on the notes on August 31, 1995. *See C.F. Trust, Inc. v. Peterson*, No. 96–1128–A, 1996 WL 33165192 (E.D.Va. Dec.9, 1996). On February 1, 1996, a Virginia state court entered judgment in favor of C.F. Trust and against the Petersons, jointly and severally, for the amount of the notes, plus interest. *C.F. Trust, Inc. v. Peterson*, No. 39433 (Va. Cir. Ct. Feb 1, 1996). In September 1998, when the Petersons still had not paid on the judgment, C.F. Trust sought and obtained a charging order from the state court that charged the Peterson interests in various partnerships, including First Flight, with paying the judgment on the notes. Then, on March 18, 1999, the district court issued garnishment orders against various Peterson corporations, including Birchwood Holdings Group, Inc., to C.F. Trust.[2]

Atlantic Funding, a Nevada corporation, holds a single note, endorsed and guaranteed by Peterson, individually and as trustee, in the principal amount of $1,000,000. Atlantic Funding purchased its note along with the right to enforce a corresponding and preexisting judgment, entered on November 15, 1991, against Peterson for the principal amount of that note, plus interest. On March 1, 1996, a Virginia state court granted Atlantic Funding a charging order charging Peterson's interest in First Flight with paying the judgment on the Atlantic Funding note, and, on March 15, 1996, issued a second charging order charging another Peterson entity with paying the same judgment.

On November 18, 1999, having still received no payment on the judgments, C.F. Trust and Atlantic Funding initiated this diversity action against Peterson, Mrs. Peterson, and Peterson's son, Scott Peterson, as well as against various Peterson entities, including First Flight. In Count I, C.F. Trust and Atlantic Funding alleged that Peterson still owed on the judgments and sought a declaration that each of the other defendants was Peterson's alter ego and, therefore, liable on the judgments. In Counts II and III, C.F. Trust and Atlantic Funding further sought an injunction and the appointment of a receiver to prevent the defendants from transferring assets "to and for the benefit of Barrie Peterson and Nancy Peterson for the purposes and with the effects of secreting their assets from legitimate creditors, of delaying, hindering and defrauding [C.F. Trust] and [Atlantic Funding] and of evading compliance with lawful federal court judgments, federal and state court charging orders and a federal court garnishment summons." Finally, C.F. Trust and Atlantic Funding advanced seven other claims, including violation of the charging orders and garnishment summons, statutory and common law conspiracy, and violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1961 et seq. (West 2000).

Prior to trial, the district court dismissed all but Counts I, II, and III, and dismissed many of the Peterson entities as

---

2. These garnishment summons required each garnishee, or recipient, to "withhold from the judgment debtor any sums of money to which the judgment debtor is or may be entitled" during the garnishment period. Each garnishee responded that "said garnishee does not owe [the Petersons] any sums of money, nor are [the Petersons] entitled to receive any sums of money for the period covering said garnishment from this garnishee."

defendants. The district court also entered summary judgment in favor of Mrs. Peterson and Scott Peterson. However, the court refused to grant summary judgment to the remaining parties—Peterson, First Flight, and Maryland Air Industries, Incorporated—on the remaining claims, reasoning that "material facts [we]re indeed genuinely disputed" as to whether Peterson abused the corporate form of his "captive" business entities "with the intent to defraud creditors or to evade a personal obligation." *See C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 111 F.Supp.2d 734, 743 (E.D.Va.2000).

The court also determined that it would allow C.F. Trust and Atlantic Funding to pursue an alter ego claim against First Flight; if successful, this would permit C.F. Trust and Atlantic Funding to pierce the corporate veil in reverse, i.e., "to reach the assets of a corporation to satisfy claims against a corporate insider." *Id.* at 740, 111 F.Supp.2d 734. The court ruled that although the Supreme Court of Virginia had not previously recognized outsider reverse veil-piercing, the Commonwealth likely would recognize the doctrine. *Id.* at 739–41. The court reasoned that outsider reverse veil-piercing, like traditional veil-piercing, aimed to prevent misuse of the corporate form "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Id.* at 742 (internal quotation marks, emphasis, and citation omitted). Accordingly, because the Supreme Court of Virginia had permitted traditional veil-piercing as a means of obtaining these ends in the appropriate case, and the Court of Appeals of Virginia had permitted outsider reverse veil-piercing to advance the same goals, the court concluded that C.F. Trust and Atlantic Funding could pursue their alter ego claim under Virginia law. *Id.* at 741.

A four-day bench trial began on August 28, 2000. The evidence presented at trial showed that Peterson had engaged in two different practices in order to avoid paying C.F. Trust's and Atlantic Funding's judgments.

First, Peterson directed transfers from various Peterson entities to Birchwood Holdings Group, Inc. (BHG), a corporation wholly owned by Peterson. BHG provided managerial and administrative support to other Peterson entities for a fee, which was calculated according to a cost allocation method. During the relevant period, however, Peterson directed transfers of approximately $1.9 million in overpayments to BHG—excess payments beyond those to which BHG was entitled based on the applicable cost allocation—and then directed BHG to pay more than $2 million of Peterson's personal expenses.

Through this method, Peterson maintained a lifestyle that, he estimated, cost "between 10 and 15 thousand dollars a month." The expenses paid by BHG included: mortgage and repair payments on a Peterson residence in Fairfax, Virginia; mortgage payments on a Peterson residence in Nantucket, Massachusetts; Peterson's country club membership fees; car payments for Peterson's Mercedes; the Petersons' credit card bills; Peterson's ATM fees; college tuition for Peterson's younger son, Christopher Peterson; and payments to Mrs. Peterson. BHG even paid the substantial legal fees incurred by Peterson and Mrs. Peterson, as well as by various Peterson entities, to defend the suits brought by C.F. Trust and Atlantic Funding to collect on their notes.

Yet, Peterson contended that he derived no salary and had no income subject to the judgments entered in favor of C.F. Trust and Atlantic Funding. Peterson instead testified that the BHG payments toward his personal expenses constituted repay-

ments of prior loans that he had made to his corporations before the dates of the judgments. However, BHG's accountant testified—and the ledgers reflected—that many of BHG's payments toward Peterson's personal expenses were "distributions," not loan repayments. Moreover, no underlying documentation supported Peterson's explanation for the disbursements or the companies' asserted obligations to Peterson, other than the checks and distributions themselves. Only in 1999 did Peterson generate "promissory notes," purportedly representing monies owed to him by his companies as repayment for the asserted loans.

First Flight provided the bulk of the transfers to BHG during this time period. First Flight, the primary source of outside revenue for the Peterson entities, owned and operated a large commercial and industrial rental property called Top Flight Airpark. Beginning in 1992 and continuing through March 15, 1996, Barrie Peterson held a 98% limited partnership interest in First Flight, including a 2% interest held by Top Flight Airpark, Incorporated, a corporation wholly owned by him. Upland Group, an entity wholly owned by Peterson's elder son, Scott Peterson, held the remaining 2% general partnership interest.

However, on March 15, 1996—six weeks after C.F. Trust obtained a judgment against Peterson and two weeks after Atlantic Funding obtained its first charging order—Top Flight withdrew as 2% partner of First Flight, and Peterson transferred half of his resulting 98% partnership interest in First Flight to Scott Peterson. Upland Group, however, retained its 2% general partnership interest. Through this transfer, Peterson purportedly surrendered legal control of First Flight to Scott Peterson, although Peterson himself continued to manage First Flight's day-to-day affairs.

This transfer provided Peterson a second means of siphoning money from First Flight, other than through intercompany transfers to BHG, to pay his personal expenses. Peterson directed Scott Peterson to distribute First Flight's funds to himself, and then pay those distributions to Mrs. Peterson or to BHG, or use the distributions to pay the personal expenses of Peterson and Mrs. Peterson. Thus, between March 15, 1996, and December 31, 1999, although First Flight did not directly distribute funds to Barrie Peterson, it distributed more than $4.3 million to Scott Peterson.

To justify these distributions, Peterson and Scott Peterson amended First Flight's partnership agreement to allow Scott Peterson, as the general partner, "to approve any distributions to the limited partners" and "to determine whether any part of the profits of the Partnership should be distributed to the limited partners." At trial, Peterson and Scott Peterson contended that this amendment to the partnership agreement extinguished the agreement's requirement of *pro rata* distributions to partners, although the amendment did not expressly alter its *pro rata* payout requirement. Peterson also argued that money used by his son to pay Peterson's own personal expenses were repayments of loans Peterson had made to his respective companies.

The district court rejected these arguments and instead held that C.F. Trust and Atlantic Funding had "conclusively established the grounds necessary to support piercing the corporate veil in reverse." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 140 F.Supp.2d 628, 645 (E.D.Va.2001). The district court applied Virginia's two-factor test for traditional veil-piercing, requiring C.F. Trust and Atlantic Funding to

prove (i) "a unity of interest and ownership" between Peterson and First Flight, and (ii) that Peterson " 'used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage.' " *Id.* at 643 (quoting *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 431 S.E.2d 318, 320 (1993)) (additional citation omitted).

As to the first factor, the court expressly found that "First Flight is the alter ego of Barrie Peterson" and "that the 'separate personalities of [First Flight and Barrie Peterson] no longer exist[.]' " *Id.* at 644 (quoting *O'Hazza*, 431 S.E.2d at 321) (alterations in original). In support of this finding, the court cited abundant evidence that Peterson "treated his corporate and personal affairs as if they were indistinguishable," used First Flight "as a device to pay his personal expenses," "maintained control over First Flight's operations," "retained decisionmaking control over First Flight," "direct[ed] that [First Flight] make distributions of substantial funds to Scott Peterson and to BHG for the payment of Barrie Peterson's personal expenses," "commingled his personal funds with the funds of the entities that he controlled and owned," and "caused First Flight to ignore the requirements of its partnership agreement," which "conclusively establish[ed]" that First Flight "failed to follow the requisite business and corporate formalities." *Id.* at 633–35, 644–45, 431 S.E.2d 318 (internal quotation marks and citations omitted). The court

also found that Peterson exercised this unilateral control over First Flight notwithstanding Upland Group's general partnership interest and Scott Peterson's limited partnership interest in First Flight.

The district court further expressly found that C.F. Trust and Atlantic Funding had satisfied the second factor for traditional veil-piercing: Peterson "used this control [over First Flight] to evade his obligations to his creditors … by directing the transfer of millions of dollars out of First Flight to Scott Peterson and to BHG for the payment of his personal expenses," without any "legitimate business purpose." *Id.* at 644, 431 S.E.2d 318. The court relied on the extensive evidence that Peterson directed First Flight to violate its partnership agreement by making distributions—which totaled more than $4.3 million—exclusively to Scott Peterson, then further directing Scott Peterson to funnel substantial sums toward Peterson's personal expenses, out of the reach of Peterson's creditors.[3] The court also noted the evidence that First Flight's transfers to BHG, made on Peterson's demand, substantially exceeded BHG's cost allocation and that Peterson specifically used BHG as part of a "scheme" to "siphon money from [his] entities to pay approximately $2 million for his personal benefit" because BHG's funds were "not subject to plaintiffs' charging orders." *Id.* at 636, 638, 431 S.E.2d 318.

**3.** The court rejected First Flight's argument that the 1996 amendments to the partnership agreement permitted Scott Peterson to make the $4.3 million in distributions, stating that the amendments gave Scott Peterson discretion *whether* to make distributions, but did not alter the requirement that all distributions be made to limited partners on a *pro rata* basis. *C.F. Trust*, 140 F.Supp.2d at 635–36. Thus, all distributions from First Flight after 1996 "should have been made [to Peterson and Scott Peterson] in proportion to each limited partner's respective ownership interests." *Id.* at 635. If this had been done, Peterson would have been entitled to $2.15 million in distributions that would have been subject to the C.F. Trust and Atlantic Funding judgments, after satisfaction of a judgment obtained by Carnett Commercial Investors, Inc. ("Carnett"), a corporation owned by Scott Peterson, to the extent that the Carnett judgment remained valid. *Id.*

For these reasons, the court held that C.F. Trust and Atlantic Funding were "entitled to an order declaring that First Flight [was] the alter ego[ ] of Barrie Peterson" and making its "assets . . . subject to" the judgments in favor of C.F. Trust and Atlantic Funding, although it denied the request for a receiver. *Id.* at 645, 431 S.E.2d 318. On March 22, 2001, the district court entered judgment in favor of C.F. Trust and Atlantic Funding.

Less than a month later, on April 6, 2001, Peterson, in his individual capacity, filed a voluntary bankruptcy petition pursuant to Chapter 11. First Flight timely noted an appeal in this action shortly thereafter. A year later, on March 1, 2002, the bankruptcy court held that to the extent that Peterson's bankruptcy petition effected a stay of this appeal pursuant to the Bankruptcy Code's automatic stay provision, 11 U.S.C.A. § 362 (West 1993), the court lifted that stay. Of course, as C.F. Trust and Atlantic Funding conceded at oral argument, determination of the relative priority of the interests of Peterson's creditors remains a matter for the bankruptcy court.

## II.

First Flight offers several reasons why the complaint assertedly "alleges" no "valid" alter ego claim against it.

■ Initially, First Flight argues that the district court should have dismissed the alter ego claim for lack of subject matter jurisdiction, citing *Peacock v. Thomas,* 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996). In *Peacock,* however, the Court held only that federal jurisdiction over claims leading to an underlying judgment provides no *ancillary* federal jurisdiction over a subsequent, post-judgment alter ego claim. *Id.* at 354–56, 116 S.Ct. 862. *Peacock* does not prohibit a federal court from taking jurisdiction over a post-judgment alter ego claim where an *independent* basis for jurisdiction exists.

In this case, unlike the plaintiff in *Peacock,* C.F. Trust and Atlantic Funding assert an independent basis for subject matter jurisdiction over their alter ego claim—diversity of citizenship—and First Flight does not contend that the diversity requirements have not been met. Accordingly, *Peacock* is inapposite. *Cf. United States v. Vitek Supply Corp.,* 151 F.3d 580, 585–86 (7th Cir.1998) (rejecting judgment debtor's argument that "federal courts cannot collect debts by piercing the corporate veils of judgment debtors" where an independent basis for jurisdiction exists).

■ Second, First Flight contends that the complaint fails to allege a necessary prerequisite to an alter ego claim, i.e., "an *existing* liability" owed by Peterson to the plaintiffs. Brief of Appellant at 28 (emphasis in original). In making this argument, First Flight fundamentally misunderstands what makes a liability "existing" for purposes of bringing a successful alter ego claim. First Flight maintains that a liability no longer "exist[s]" after a court reduces it to judgment, and that, by extension, post-judgment conduct cannot form the basis of an alter ego claim.

This appears to be in the nature of a res judicata or merger argument, though its logic is difficult to discern. What is clear, however, is that C.F. Trust and Atlantic Funding have alleged (and proved) Peterson's liability to them for the valid notes they hold. That this liability has been already reduced to judgment does not somehow invalidate it or render it an improper basis upon which to assert an alter ego claim, as First Flight seems to believe. Often a court has reduced a defendant's underlying liability to judgment before a plaintiff asserts an alter ego claim. *See, e.g., Steyr Daimler–Puch of Am. Corp. v.*

*Pappas,* 852 F.2d 132 (4th Cir.1988) (applying Virginia law and considering whether judgment creditor or bankruptcy trustee had authority to bring post-judgment alter ego claim); *Greenberg v. Commonwealth,* 255 Va. 594, 499 S.E.2d 266, 270–72 (1998) (determining whether sufficient evidence existed to pierce the veil on a post-judgment alter ego claim); *Sloan v. Thornton,* 249 Va. 492, 457 S.E.2d 60 (1995) (same).

 Furthermore, because a judgment establishes, rather than extinguishes, a party's liability, C.F. Trust and Atlantic Funding can properly allege Peterson's post-judgment conduct as a basis for their alter ego claim. After all, to prevail on an alter ego claim, a party must show that the individual uses the alter ego to *"evade a personal obligation,* to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Greenberg,* 499 S.E.2d at 272 (quoting *O'Hazza,* 431 S.E.2d at 320) (emphasis added). A defendant's post-judgment actions frequently illustrate his use of an alter ego to "evade a personal obligation." *Cf. Select Creations, Inc. v. Paliafito Am., Inc.,* 852 F.Supp. 740, 774 (E.D.Wis.1994) ("It is particularly appropriate to apply the alter ego doctrine in 'reverse' when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the *pre-existing liability* of the controlling party." (emphasis added)).

For these reasons, we reject First Flight's contentions as to the validity of the allegations in the complaint.

### III.

Alternatively, First Flight argues that the district court erred in permitting C.F. Trust and Atlantic Funding to pursue their alter ego claim. First Flight asserts that Virginia does not recognize the kind of alter ego claim alleged here—one for "out-sider reverse veil-piercing." In addition, First Flight maintains that, even if Virginia does recognize a claim for outsider reverse veil-piercing, the doctrine applies only to corporations and does not extend to limited partnerships.

### A.

 In a traditional veil-piercing case, a creditor of a corporation seeks to reach the assets of a corporate shareholder or director to satisfy a corporate debt. *See, e.g., Perpetual Real Estate Servs. v. Michaelson Props.,* 974 F.2d 545, 548–49 (4th Cir.1992). Outsider reverse veil-piercing extends this traditional veil-piercing doctrine to permit a third-party creditor to "pierce[ ] the veil" to satisfy the debts of an *individual* out of the corporation's assets. *See, e.g., Goya Foods, Inc. v. Unanue,* 233 F.3d 38, 43 (1st Cir.2000).

 Indisputably, as First Flight concedes, Virginia has long recognized traditional veil-piercing claims. Although Virginia courts strongly adhere to the principle that "a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it," *Cheatle v. Rudd's Swimming Pool Supply Co.,* 234 Va. 207, 360 S.E.2d 828, 831 (1987), they have held that traditional veil-piercing "is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice." *O'Hazza,* 431 S.E.2d at 320–21 (citations omitted); *see also, e.g., Greenberg,* 499 S.E.2d at 272. However, Virginia courts clearly regard corporate veil-piercing as an "extraordinary" remedy, permitted only in exceptional circumstances when "necessary to promote justice." *Cheatle,* 360 S.E.2d at 831 (citation omitted).

Thus, Virginia courts require a party seeking to pierce a corporate veil to prove that (i) the corporation is "the alter ego, alias, stooge, or dummy" of the individual, *Cheatle*, 360 S.E.2d at 830–31, and (ii) the individual used the corporation to "evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Greenberg*, 499 S.E.2d at 272 (quoting *O'Hazza*, 431 S.E.2d at 320); *see also Beale v. Kappa Alpha Order*, 192 Va. 382, 64 S.E.2d 789, 798 (1951). Accordingly, by this second requirement, Virginia, unlike some jurisdictions, mandates proof of fraud or a legal "wrong" as a requisite to recovery. *See Perpetual Real Estate*, 974 F.2d at 548–49; *Cheatle*, 360 S.E.2d at 831; *see also Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 147 S.E.2d 747, 753 (1966) (stating that the second requirement is satisfied "although the acts of the parties amount to constructive fraud only, the rule not being limited to cases where they have been guilty of actual fraud and criminal intent" (citation omitted)).[4]

"Many jurisdictions recognize that the same considerations that justify piercing the corporate veil may justify piercing the veil in 'reverse.'" 1 William Meade Fletch-er, Cyclopedia of the Law of Private Corporations, § 41.70 at 685 ((rev.vol.1999) (citations omitted)); *see also 718 Arch St. Assocs. v. Blatstein (In re Blatstein)*, 192 F.3d 88, 100–01 (3d Cir.1999); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997); *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir.1991); *LFC Mktg. Group, Inc. v. Loomis*, 116 Nev. 896, 8 P.3d 841, 846 (2000); *Roepke v. Western Nat. Mut. Ins. Co.*, 302 N.W.2d 350, 352–53 (Minn.1981); *Litchfield Asset Mgmt. Corp. v. Howell*, 70 Conn.App. 133, 149–52, 799 A.2d 298 (2002).

As the Supreme Court of Vermont has explained in permitting an outsider reverse veil-piercing claim, "[a]lthough one purpose of corporation law is to limit shareholders' liability for corporate debts, ... corporations are not intended to be used to shelter the assets of shareholders from lawful claims of judgment creditors." *Winey v. Cutler*, 165 Vt. 566, 678 A.2d 1261, 1262 (1996); *see also LFC Mktg. Group*, 8 P.3d at 845–46; *Olen v. Phelps*, 200 Wis.2d 155, 546 N.W.2d 176, 179–80 (Ct.App.1996); *Lambert v. Farmers Bank*, 519 N.E.2d 745, 747–49 (Ind.Ct.App.1988).[5]

---

4. One commentator has erroneously stated that this court has not mandated compliance with Virginia's requirement of fraud or a "legal wrong." *See* Wendy B. Davis, The Failure of the Federal Courts to Support Virginia's Reluctance to Pierce the Corporate Veil, 5 J. Small & Emerging Bus. L. 203, 216 (2001). In fact, we have consistently enforced this requirement and in *Perpetual Real Estate* reiterated that "Virginia adheres to a rigorous standard requiring proof that the defendant used the corporation to 'disguise' some legal 'wrong'," unlike some jurisdictions that "permit[ ] the corporate veil to be pierced in appropriate circumstances even in the absence of fraud or wrongdoing." 974 F.2d at 548–49 (internal quotation marks and citations omitted).

5. Indeed, although outsider reverse veil-piercing reflects a relatively recent modification of the traditional veil-piercing doctrine, state courts that have denied a claim for reverse veil-piercing typically have done so because the facts of the given case did not support reverse veil-piercing, not because they reject outsider reverse veil-piercing *per se*. *See, e.g., Plaza Props. v. Prime Bus. Invs.*, 240 Ga.App. 639, 524 S.E.2d 306, 310 (1999) (stating that court "need not consider whether a 'piercing the corporate veil' theory may be applied in reverse—i.e., to render a corporation liable for its sole shareholder's individual obligations—because such a theory was not raised at trial nor ruled on by the trial court" (emphasis omitted)); *Thomsen Family Trust, 1990 v. Peterson Family Enters., Inc.*, 66 Ark. App. 294, 989 S.W.2d 934, 937–38 (1999) (stating that although appellants were "seek-

The district court concluded that Virginia, too, would recognize "the outsider reverse piercing cause of action." *C.F. Trust*, 111 F.Supp.2d at 740. The court reasoned that because "the rationale for traditional piercing operates with equal force in support of reverse piercing," and because the Court of Appeals of Virginia "ha[d] recognized the outsider reverse piercing cause of action," the Supreme Court of Virginia would also do so if a "plaintiff c[ould] establish the requisite grounds." *Id.* at 740–41.

The Court of Appeals case on which the district court relied, *Fox v. Fox*, Nos. 0721–97–4 & 1094–97–4, 1998 WL 114010 (Va.Ct.App.1998), involved a doctor in the midst of a divorce, who had "embarked upon a scheme to defraud" his wife "through the use of a series of limited partnerships, trusts, and corporations which in reality [we]re simply an attempt by [Dr. Fox] to fraudulently hide marital assets and prevent their proper distribution." *Id.* at *8. On appeal, Dr. Fox "appear[ed] to contend that the trial court erred in finding that various entities were, in fact, his alter egos" but "advance[d] no argument to support this contention." *Id.* at *7. The Court of Appeals, after noting that it would not make Dr. Fox's argument for him, concluded, without further discussion, that the record supported the trial court's determination that "various entities and Dr. Fox shared a unity of interest and ownership, such that their separate personalities no longer existed." *Id.* at *8. The appellate court thus affirmed the trial court's reverse veil-piercing order.

 First Flight contends that *Fox* constitutes "inadequate authority" to predict Virginia law because its "alter ego

ing a 'reverse piercing of the corporate veil,' " court found "no evidence to warrant disregarding the corporate form"); *Castillo v. M.E.K. Constr., Inc.*, 741 So.2d 332, 342

discussion" constitutes dicta and the opinion is not reported. Even if the *Fox* court's reverse veil-piercing discussion constitutes dicta—which is not at all clear to us—no authority states that this precludes a federal court from using it to predict state law. *Fox's* unreported status does limit, but not eliminate, its predictive value. *See King v. Order of United Commercial Travelers*, 333 U.S. 153, 160–61, 68 S.Ct. 488, 92 L.Ed. 608 (1948) (holding that while an unpublished opinion from lower state court on an issue of state law does not control, a federal court may "properly attribute[ ] some weight" to it). The district court's decision to accord *Fox* predictive value, despite its unpublished status, seems particularly justified given that in a later, reported opinion, also involving Dr. Fox, the Court of Appeals of Virginia noted—and seemingly approved—the trial court's subsequent decision to allow reverse veil-piercing against still another "sham" entity, a limited partnership that the trial court "declared to be the 'alter ego' of Dr. Fox." *Glanz v. Mendelson*, 34 Va.App. 141, 538 S.E.2d 348, 350 (2000).

Furthermore, eight years before *Fox*, the Court of Appeals of Virginia had recognized reverse veil-piercing in a reported opinion. *See Stainback v. Stainback*, 11 Va.App. 13, 396 S.E.2d 686, 692–93 (1990). In *Stainback*, another domestic relations suit, the court expressly approved the use of outsider reverse veil-piercing and upheld the trial court's finding that a corporation, formed by the husband and his father, whose assets consisted exclusively of artwork created by the husband, was the husband's alter ego. *Id.* at 693. The Court of Appeals of Virginia briefly explained:

(Miss.Ct.App.1999) ("In conclusion, we find that this case has not presented facts sufficient to justify [reverse] piercing of the corporate veil[.]").

[The husband's father formed the corporation] for the benefit of the husband and his father, and the interests of ownership and management are inextricably intertwined. The husband has served as president and director since inception.... The parties, together with the husband's parents, guaranteed corporate debt. Profits, including monies generated by sale of the husband's paintings, are expended for the husband's personal use.

*Id.* at 692–93. The court's judgment declaring the corporation the alter ego of the husband therefore rendered the corporation liable for, or made its assets susceptible to, the marital liabilities of the husband, i.e., pierced the veil in reverse. *Id.*

■ Unquestionably, when a federal court sits in diversity, as in the case at hand, it "is not free to reject [a] state rule merely because it has not received the sanction of the highest state court." *West v. AT & T*, 311 U.S. 223, 236, 61 S.Ct. 179, 85 L.Ed. 139 (1940) (citations omitted). Rather, when "an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 237, 61 S.Ct. 179; *accord Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467, 61 S.Ct. 336, 85 L.Ed. 284 (1940); *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002–03 (4th Cir.1998); *United States v.*

*Little*, 52 F.3d 495, 498 (4th Cir.1995); *Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir.1992).[6]

■ Although First Flight has offered no such "data," we have difficulty discerning precisely what "rule of law" the Court of Appeals of Virginia has announced in its brief discussions in *Fox* and *Stainback*. Clearly, the court has approved reverse veil-piercing in two domestic relations cases, but without identifying the scope of the doctrine or articulating what standards a plaintiff must meet to establish such a claim.

The district court implicitly or explicitly resolved both of these unanswered questions. First, the district court apparently concluded that the reverse veil-piercing doctrine was not confined to the particular circumstances in *Fox* (the court did not cite *Stainback*) or the domestic relations context, but rather generally available. The court then expressly held that a party seeking to pierce the corporate veil in reverse must satisfy the two-factor test required in a traditional veil-piercing case, i.e., proof of a unity of interest and control between an individual and a corporation and that the individual used the corporation to commit fraud or a legal wrong. *See C.F. Trust*, 111 F.Supp.2d at 741–43. As noted above, the district court then issued detailed findings, supported by ample evidence, outlining how C.F. Trust and Atlantic Funding had "conclusively established" both traditional factors. *See supra* at 131–32; *see also C.F. Trust*, 140 F.Supp.2d at

**6.** One of our sister circuits has refused to permit reverse veil-piercing "[a]bsent a clear statement" by the state's highest court adopting the doctrine, but in doing so it noted that *no* state case in the applicable jurisdiction had previously recognized reverse veil-piercing—unlike the situation here. *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576–77 (10th Cir.1990); *see also Floyd v.*

*IRS*, 151 F.3d 1295, 1298–99 & n. 4 (10th Cir.1998) (requiring a "clear statement" because although the highest state court had once "appl[ied]" a variant of reverse piercing ... in a jurisdictional context," that application "should not be presumed to translate into substantive corporate law" (emphasis omitted)).

633–45; *C.F. Trust,* 111 F.Supp.2d at 737–44.

The district court certainly acted reasonably in following this test and making these findings. A Virginia court, confronted with the evidence in this case, might well reach identical conclusions. However, we do not believe that Virginia case law enables us to predict this with authority.

Given Virginia's well-established treatment of traditional veil-piercing as an "extraordinary exception," *Cheatle,* 360 S.E.2d at 831 (citation omitted), a Virginia court might refuse to extend the doctrine to allow reverse veil-piercing beyond the particular facts of *Fox* and *Stainback,* or the domestic relations context. We note that while "it is not unusual for a domestic relations court to pierce the corporate veil [in reverse] in a dissolution proceeding," *see, e.g., Medlock v. Medlock,* 263 Neb. 666, 642 N.W.2d 113, 125 (2002) (citing cases), reverse veil-piercing is less common in ordinary commercial cases. No court has discussed the reason for this.

Possibly, a Virginia court might regard reverse veil-piercing as particularly appropriate in domestic relations cases because of the special nature of marital property, *see, e.g.,* Va.Code Ann. § 20–107.3(a)(2) (Michie 2000), the strong interest in effecting a fair distribution of "accumulate[d] marital wealth" at the end of a marriage, *see Dietz v. Dietz,* 17 Va.App. 203, 436 S.E.2d 463, 467 (1993), and the state's strong public policy favoring protection of dependent spouses and children. *See, e.g., Verrocchio v. Verrocchio,* 16 Va.App. 314, 429 S.E.2d 482, 486 (1993); *Blank v. Blank,* 10 Va.App. 1, 389 S.E.2d 723, 724 (1990); *see also* Va.Code Ann. § 20–107.1 (Michie 2000) (spousal support); *id.* § 20–108.2 (Michie 2000 & Supp.2001) (child support). To be sure, a Virginia court might afford creditors, who may also have strong equitable claims, as C.F. Trust and Atlantic Funding do in this case, the benefits of reverse veil-piercing. But a court could differentiate between the two situations and conclude that reverse veil-piercing should be confined to domestic relations cases.

Alternatively, a Virginia court might well permit reverse veil-piercing in the commercial context, at least on egregious facts like those at issue here, but require proof beyond the two factors necessary for traditional veil-piercing. For example, some courts and commentators have suggested that in a true outsider reverse veil-piercing case, a plaintiff also must prove that no innocent third party, such as a third-party creditor or shareholder, would suffer harm or prejudice as a consequence of reverse veil-piercing. *See, e.g., State Bank in Eden Valley v. Euerle Farms, Inc.,* 441 N.W.2d 121, 125 (Minn.Ct.App. 1989) (considering harm to other creditors); *Litchfield Asset Mgmt.,* 70 Conn. App. at 151 & n. 14, 799 A.2d 298 (stating that reverse veil-piercing is permitted only "when necessary to achieve an equitable result and when unfair prejudice will not result" and considering whether harm to other shareholders would result); 1 Fletcher § 41.20 at 596 (stating that the alter ego doctrine "cannot be applied to prejudice the rights of an innocent third party"); Gregory S. Crespi, The Reverse Pierce Doctrine: Applying Appropriate Standards, 16 J. Corp. L. 33, 65 (1990) (stating that a "key factor" in an outsider reverse veil-piercing case is the prejudice to "corporate shareholders other than the insider against whom the outsider is asserting the primary claim"). A Virginia court might—or might not—regard this additional factor as a necessary safeguard against the potential for harm or prejudice to innocent third-party shareholders or creditors not otherwise liable on the underlying judgment, a risk that does not

exist in the traditional veil-piercing context.

Because of the brevity and generality of the discussion in the Virginia cases approving reverse veil-piercing, *Fox* and *Stainback*, we simply do not know if Virginia would recognize the doctrine outside the specific or general context of those cases, and, if so, what proof it would require for a reverse veil-piercing claim in the present context.

## B.

First Flight also maintains that in any event reverse veil-piercing cannot apply to it as a limited partnership. First Flight argues that even if Virginia generally would permit outsider reverse veil-piercing claims against corporations, no corollary right permits reverse veil-piercing claims against limited partnerships.

A limited partnership, like a corporation, exists under state statutory law and constitutes a business entity separate from its members. *See* Va.Code Ann. § 50–73.1 (Michie 1998). One or more general partners and one or more limited partners comprise a limited partnership. *Id.* A general partner manages the partnership's operation and bears responsibility for the partnership's obligations; in contrast, "like a corporate minority shareholder, a limited partner generally has no voice in the management of the partnership and cannot control investment policies or partnership distribution." *Estate of Godley v. Commissioner*, 286 F.3d 210, 215 (4th Cir.2002) (internal quotation marks and citation omitted); *accord Kumar v. Metro. Hosp., L.P.*, 30 Va. Cir. 226 (1993); *First Union Nat'l Bank v. Allen Lorey Family Ltd.*, 34 Va. Cir. 474 (1994).

Limited partnerships and corporations share many common features; of particular significance here, "[d]ebts of limited partnerships and corporations generally are not the personal liability of limited partners or corporate shareholders." *Sloan*, 457 S.E.2d at 61. The reverse also holds true; limited partnerships and corporations generally bear no responsibility for the liabilities of limited partners or corporate shareholders. *See* 14A Michie's Jurisprudence of Virginia and West Virginia § 77 at 430 (1989) (discussing partnerships); 1 Fletcher § 14 at 432 (discussing corporations).

Of course, exceptions to these general rules exist, as the traditional veil-piercing cases themselves demonstrate. Moreover, in *Fox*, the primary reverse veil-piercing case relied on by the district court, the Court of Appeals of Virginia permitted reverse veil-piercing against a limited partnership. In the later, related *Glanz* case, the same court noted that the trial court had subsequently permitted reverse veil-piercing against another "sham" entity of Dr. Fox, also a limited partnership. *Glanz*, 538 S.E.2d at 350.

However, in *Sloan*, a traditional veil-piercing case, the Supreme Court of Virginia seems to have suggested a possible distinction between the application of veil-piercing to a corporation and its application to a limited partnership. The plaintiff in *Sloan* sought to hold an individual—who was both a *limited* partner of the limited partnership and a shareholder of the partnership's *general* partner, a corporation—personally liable for the debts of a limited partnership. The *Sloan* court compared the bases for the individual's potential liability in each of these roles, stating:

> A limited partner ... may be liable for the obligations of the limited partnership if the limited partner is also a general partner or if he participates in the control of the business. Code § 50–73.24. Similarly, under certain conditions, the corporate structure may be

disregarded or pierced and a shareholder or director of the corporation held personally liable for the corporation's debts. *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 431 S.E.2d 318 (1993); *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828 (1987)....

.....

.... The liabilities of limited partners for the debts of limited partnerships are governed by the Virginia Revised Uniform Limited Partnership Act, not the common law.

*Sloan*, 457 S.E.2d at 61–62, 64.

*Sloan* does not necessarily preclude veil-piercing of a limited partnership, because the plaintiff there did not attempt to apply the veil-piercing doctrine to the limited partnership; he only sought to pierce the veil of a corporation—the general partner—*or* hold the defendant limited partner liable under the Virginia Revised Uniform Limited Partnership Act, §§ 50–73.1 to 50–73.77 (Michie 1998) (the Act). But the above-quoted language implies that, while shareholders of a corporation may be liable for a corporation's obligations in a common-law, traditional veil-piercing action, limited partners may be liable for a limited partnership's obligations only under circumstances expressly set forth in the Act.[7]

The discussion in *Sloan* leaves us uncertain whether, under Virginia law, the Act provides the exclusive remedy for judgment creditors of individual limited partners. Moreover, even if this constitutes the general rule, we cannot discern whether Virginia courts would allow an exception in circumstances like those in the case at hand, in which the defendant has improperly foiled the plaintiff-creditors in pursuing the remedies provided by the Act. Both C.F. Trust and Atlantic Funding, consistent with the Act, sought and obtained charging orders charging Peterson's partnership interest in First Flight with paying their respective judgments against him. Their efforts proved futile, however, and the judgments remained outstanding because First Flight refused payment based on Peterson's engineered plan to disclaim any partnership interest while simultaneously siphoning millions of dollars from First Flight.

Recently, a Connecticut court considered a similar situation in *Litchfield Asset Management*, 70 Conn.App. 133, 799 A.2d 298. There the court upheld reverse veil-piercing against a limited liability company—a business organization similar to a limited partnership—notwithstanding a statutory provision worded almost identically to § 50–73.46. *Id.* at 148–53, 799 A.2d 298. The court held extension of the reverse veil-piercing doctrine to limited liability companies particularly appropriate when the debtor "did not receive regular distributions but rather, paid her personal bills directly using limited liability company funds. Any attempt by the plaintiff to attach distributions, therefore, would have been fruitless." *Id.* at 151 n. 14, 799 A.2d

---

**7.** The Act provides that a limited partner may be liable for the obligations of the partnership if the limited partner "is also a general partner" or if he "participates in the control of the business," but even then only to creditors that "reasonably believ[e], based on the limited partner's conduct, that the limited partner is a general partner." Va.Code Ann. § 50–73.24. For judgment creditors of an individual limited *partner*, rather than the partnership, the Act provides that the creditor may apply to the court for a charging order charging "the partnership interest of the partner with payment of the unsatisfied amount of the judgment with interest." *Id.* § 50–73.46. The statute defines "partnership interest" as "a partner's share of the profits and losses of a limited partnership and the right to receive distributions of partnership assets." Va.Code Ann. § 50–73.1.

298. If a Virginia court followed the rationale of *Litchfield Asset Management*, outsider reverse veil-piercing against the limited partnership would be a viable option in this case, even if not generally permitted in cases involving limited partnerships. If not, and if the Act provides the exclusive remedies for creditors of individual limited partners seeking to reach the assets of the limited partnership, then no action for reverse veil-piercing would lie against First Flight as a limited partnership.

For these reasons, we cannot conclude that Virginia courts would permit reverse veil-piercing against a limited partnership.

### C.

In sum, we remain uncertain as to whether Virginia would permit a reverse veil-piercing claim in this commercial case against a limited partnership, and what standards would apply if the Commonwealth did permit such a claim. Accordingly, we respectfully certify to the Supreme Court of Virginia, pursuant to its discretionary authority under Rule 5:42 of the Rules of the Supreme Court of Virginia, the following interrelated questions:

(1) Would Virginia recognize a claim for outsider reverse veil-piercing under the facts of this case?

(2) If the answer to (1) is yes, what standards must be met before Virginia would allow reverse veil-piercing of the limited partnership?

*See* Va. Sup.Ct. R. 5:42(a).

In the event that the Supreme Court of Virginia accepts certification and answers the first question in the negative, C.F. Trust and Atlantic Funding cannot pierce the veil of First Flight, and we therefore must reverse the judgment of the district court. If the Supreme Court of Virginia accepts certification and answers the first question in the affirmative, however, C.F. Trust and Atlantic Funding may pierce the veil of First Flight in reverse, provided they meet the standards articulated by the Supreme Court of Virginia in response to the second question.

### IV.

We cannot determine from the applicable Virginia authorities whether Virginia would permit an outsider reverse veil-piercing claim in this case and, if so, what standards must be met before Virginia would allow reverse veil-piercing of the limited partnership. We therefore certify the above questions to the Supreme Court of Virginia. The accompanying certification order shall first be released to counsel, who shall have 7 days to submit suggested changes to the statement of facts. We reserve the right to modify this opinion in light of the comments received.

*QUESTIONS CERTIFIED TO THE SUPREME COURT OF VIRGINIA.*

Robert DOE, a/k/a Virginia Privacy Litigation; Tays Doe, a/k/a Virginia Privacy Litigation; Buck Doe, a/k/a Virginia Privacy Litigation; Otis Doe,