# Francis E. O'Hazza, et al.

## v.

# Executive Credit Corporation

Record No. 921441

June 11, 1993

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Hassell, JJ., and Cochran, Retired Justice

*Jacob A. Kamerow (Kamerow & Kamerow*, on briefs), for appellants.

*James E. Pinkowski (Lawrence, Smith & Pinkowski*, on brief), for appellee.

JUSTICE LACY delivered the opinion of the Court.

In this appeal we consider whether the trial court properly pierced the corporate veil and imposed personal liability for a debt of the corporation on the corporate shareholders.

In January 1987, Sounds You See, Inc. (the corporation) was duly incorporated in accordance with Virginia law. Guy R. O'Hazza was the president of the corporation. Guy O'Hazza's parents, Francis E. and Susie W. O'Hazza (the O'Hazzas), were the vice president and secretary-treasurer, respectively, and the sole stockholders. The O'Hazzas provided the initial capitalization for the corporation by contributing $10,000. The corporation issued a stock certificate to the O'Hazzas, jointly, for fifty shares of stock in the corporation. The corporation made a subchapter S election for federal income tax purposes.

The corporation operated from 1987 to 1989 and engaged in the business of installing sound equipment in commercial establishments. Guy O'Hazza conducted the day-to-day affairs of the business and received $4,500 a month, taken as a corporate loan in lieu of salary.

The corporation's tax returns and financial statements prepared by its accountants showed that the O'Hazzas lent the corporation approximately $64,000 in 1988 and $75,000 in 1989. The 1989 amount included a $20,000 loan and a $50,000 line of credit for the corporation with Burke and Herbert Bank, which the O'Hazzas arranged, personally guaranteed, and repaid. There were no corporate documents that authorized or memorialized these debts and the O'Hazzas testified that they had no expectation of repayment by the corporation.

Patrick J. Hughes, president of Executive Credit Corporation (ECC), met Guy O'Hazza in early 1988. ECC was in the business of

leasing equipment that it brokered to others or retained in its own accounts. Hughes testified that ECC was involved in approximately 10 business deals with Sounds You See, Inc., prior to the project that gave rise to the loan at issue in this case.

In October 1988, Guy approached Hughes regarding a project to install a sound system in the Hilton Hotel in Baltimore, Maryland. Guy told Hughes about the corporation's financial status and its cash flow problems and indicated that he would need an "arrangement" with Hughes in order to do the hotel project. Under the "arrangement," Hughes would advance the money to the corporation for the purchase of the equipment to be installed. After installation, the ownership of the equipment would be transferred to ECC and it would lease the equipment to the hotel for a profit.

After meeting with the general manager of the hotel about the project and receiving assurances that the hotel was "definitely going to go ahead with some sort of sound and lighting and video system," Hughes agreed to advance Guy funds for the equipment purchase. Hughes understood that, if the deal with the hotel did not go through, the equipment would be used for "any one of a number of other proposed jobs, and that [Hughes] would secure a lease with whoever that company was and then get [his] money back." Hughes also testified that, based on Guy's representations and statements the O'Hazzas made before the hotel project arose, he believed that the O'Hazzas would "stand behind these deals."[1]

ECC advanced the money in three installments: $15,990 on December 12, 1988; $9,450 on January 31, 1989; and $10,000 on February 7, 1989. A December 14, 1988, invoice from Sounds You See, Inc., indicates that it purchased equipment for the hotel project and billed it to ECC. That invoice, totalling $15,990 for equipment and labor, was marked "Paid in Full." On February 7, at Hughes's insistence, Guy executed a promissory note for $35,000 payable on demand to ECC.

Hughes drafted the lease documents for the hotel's signature, but learned in March 1989 that the management of the hotel had refused to approve the installation and lease of the equipment. Consequently, the transaction was never consummated. After repaying $1,000 of the loan, Guy informed Hughes that he did not intend to pay the remainder of the debt.

---

[1] At trial, counsel for ECC conceded that there was no evidence of any written or verbal guarantees by the O'Hazzas, and that ECC relied solely on piercing the corporate veil to impose liability on the O'Hazzas.

ECC filed suit to recover the remaining unpaid balance of the loan, naming Sounds You See, Inc. and its sole shareholders, Francis E. and Susie W. O'Hazza, as defendants.[2] After an *ore tenus* hearing, the trial court held that Sounds You See, Inc. was a sham corporation, the instrumentality and alter ego of its shareholders, the O'Hazzas, "employed for the sole purpose of transferring funds to their son." Based on this holding, the trial court disregarded the corporate entity and entered judgment against the O'Hazzas for $34,000. We awarded them an appeal.

■ The independent legal existence of a corporation is a basic component of corporate law and of the economic policy it supports. *Cheatle* v. *Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828 (1987). Ignoring the separate existence of a corporation and imposing personal liability on shareholders for debts of the corporation is an extraordinary act to be taken "only when necessary to promote justice." *Id.* at 212, 360 S.E.2d at 831 (citation omitted).

■ There is no single rule or criterion that can be applied to determine whether piercing the corporate veil is justified. The cases and commentators generally agree, however, that one who seeks to disregard the corporate entity must show that the shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage. *Lewis Trucking Corp.* v. *Commonwealth*, 207 Va. 23, 31, 147 S.E.2d 747, 753 (1966); F. Hodge O'Neal and Robert B. Thompson, *O'Neal's Close Corporations* § 1.10 (3d ed. 1971 and Supp. 1992). Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice. *Lewis Trucking*, 207 Va. at 32, 147 S.E.2d at 753-54; 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.30 (perm. ed. rev. vol. 1990) (hereinafter Fletcher).

■ Each case is *sui generis* and requires examination of the particular factual circumstances surrounding the corporation and the acts in question. Determination of these facts is within the province of the trial court and that court's findings "will not be overturned on appeal unless clearly erroneous." *Cheatle*, 234 Va. at 213, 360

---

[2] Sounds You See, Inc.'s corporate existence was automatically terminated for failure to pay the annual license fee. Code § 13.1-752. A default judgment was entered against the defunct corporation.

S.E.2d at 831. In this case, the trial court found that the undercapitalization of, and continuing loans to, the corporation and a non-business corporate purpose with associated personal tax advantages, established the requisite lack of separate identities between the corporation and the O'Hazzas. The trial court further found that the O'Hazzas' failure to take responsibility for the corporation's activities resulted in an injustice to ECC, the creditor here. Thus, the trial court concluded that piercing the corporate veil was justified.

■ Based upon our review of the record and relevant case law, we conclude that, as a matter of law, the factual findings and the factors utilized by the trial court to pierce the corporate veil either are not supported by the record or do not support the trial court's conclusions. We will consider the factors relied upon by the trial court and its factual findings *seriatim.*

### Undercapitalization and Continuing Loans

The O'Hazzas contributed $10,000 in initial capital to the corporation, and subsequently loaned the corporation approximately $140,000 over a two-year period. The trial court specifically found that the corporation was undercapitalized and that the corporation would have "failed almost immediately" without the loans from the O'Hazzas.

Initial capitalization of a corporation can be an indicator of whether a corporation was created and operated as a sham or as the alter ego for another corporation or person. If, from its inception, a corporation is unable to pay its costs of doing business because of grossly inadequate capitalization, its legitimacy is suspect. Under such circumstances, stockholders may not be entitled to the corporate shield. Fletcher § 44.1. Thus, the court in *In re County Green Ltd. Partnership,* 438 F. Supp. 701 (W.D. Va. 1977), held that initial capitalization of $100, accompanied by a situation in which the controlling shareholder drained the corporation's earnings and increased the corporation's financial dependency, were factors used to justify a decision to pierce the corporate veil. *Id.* at 706.

■ In the instant case, ECC produced no evidence to show what an appropriate level of capitalization would have been for a business that installed sound equipment. Consequently, a determination that $10,000 was insufficient initial capitalization is questionable, particularly in light of the $9,412 profit shown on the corporation's federal tax return for 1987, its first year of operation.

We note also that, to gain certain tax advantages, small corporations increasingly, and legitimately, choose to initially capitalize the entity with a small portion of the investment represented by stock and with the larger portion of capital set up as loans to the corporation. If the corporation fails, these loans are subordinated to those of other creditors. Fletcher § 44.1. And, as pointed out by the O'Hazzas, federal courts, in distinguishing between corporate debt and risk capital, have considered a loan made to a corporation by stockholders without expectation of repayment as an indication that the transaction involved venture capital, not a true loan. *See e.g.*, *Liflans Corp.* v. *United States*, 390 F.2d 965 (Ct. Cl. 1968); *Cuyuna Realty Co.* v. *United States*, 382 F.2d 298, 301 (Ct. Cl. 1967); *P.M. Finance Corp.* v. *Commissioner*, 302 F.2d 786 (3d Cir. 1962).

█ Finally, we never have recognized loaning money to a business that is sustaining losses as a ground for piercing the corporate veil. In *Garrett* v. *Ancarrow Marine, Inc.*, 211 Va. 755, 180 S.E.2d 668 (1971), creditors of a closely held corporation were unsuccessful in their attempt to pierce the corporate veil and enforce a mechanic's lien against the property of the corporation's stockholders, even though the corporation was "insolvent and able to continue in business only because of substantial loans made" by the stockholders. *Id.* at 756, 180 S.E.2d at 669.

█ We find that the trial court clearly erred in finding that the corporation was undercapitalized and in relying on this finding and the fact of the subsequent loans by the O'Hazzas to the corporation as grounds for piercing the corporate veil.

### Corporate Purpose and Personal Tax Advantages

Integral to the trial court's conclusion that the corporation was a sham and an instrumentality of the O'Hazzas were its findings that: (1) the primary purpose of the corporation was to allow the O'Hazzas to provide a constant source of income to Guy O'Hazza through a monthly loan from the corporation; and (2) that the subchapter S election by the corporation allowed the O'Hazzas to "derive a tax benefit from the operating losses of the corporation, while at the same time avoiding any gift tax associated with the transfer of these funds from the shareholders to their son."

The O'Hazzas testified that they felt an obligation as parents to give their son financial support, and that they gave their son the money "[f]or business purposes and so he'd have a job." They also

testified that they "intended the money to go into the business," and that the "corporation was a business to make money."

This testimony, which the trial court stated from the bench that it believed, at a minimum dictates a conclusion that the corporation was not formed for a single purpose, but for purposes that included the hope of establishing a functioning, viable business. In fact, the corporation had gross receipts exceeding $1 million over its corporate life, had up to seven employees, and had a number of subcontractors and installation jobs. It had the attributes of an ongoing business.

■ Even if the O'Hazzas established and funded the corporation to provide a personal benefit to their son, as the trial court found, the corporation did not operate solely as a paper entity to pass money from parents to child. The testimony and financial documents, including tax returns, show that the trial court's holding that the purpose of the corporation was "not for any proper business purpose" is clearly erroneous and, therefore, does not support piercing the corporate veil.

■ Similarly, neither the actual nor the potential tax consequences to the O'Hazzas from subchapter S election suggests any impropriety justifying piercing the corporate veil. Election of subchapter S status for federal tax purposes is common and legitimate. In this case, the election resulted in the O'Hazzas reporting both income and losses from the corporation's operations on their federal tax returns.[3]

### Breach of Fiduciary Duty

The trial court found that the O'Hazzas did not engage in any actual fraud, but that their knowledge of the "corporation's financial difficulties with others" and their "disregard for *any* responsibility regarding the corporation," allowed Guy O'Hazza to "continue improperly dissipating corporate assets." Relying on *In re County Green Ltd. Partnership*, 438 F. Supp. 701 (W.D. Va. 1977) the trial court held that this lack of active oversight on the part of the O'Hazzas was a "breach of their fiduciary duty to the corporation and its creditors."

---

[3] If the sole purpose of the corporation was to benefit the O'Hazzas, Guy O'Hazza's monthly draw should have been taken as a direct salary, not as a loan, thereby increasing the corporation's deficit position for tax purposes in 1988 and 1989.

The *County Green* case does not address the factual situation of this case and is inapposite here. There, the controlling shareholder of a development corporation ran that corporation and did so in its own interest, not in the interest of the corporation. Under those circumstances, the court held that the shareholder breached its fiduciary duty of good faith and fair dealings owed to the corporation and its creditors and, therefore, "operated in effect as a fraud on creditors." 438 F. Supp. at 707.

█ Here, the O'Hazzas, although controlling shareholders, were not involved in, and did not exercise any direction or control over, the corporation's activities. *County Green* addresses the parameters of fiduciary duty only in the context of the controlling shareholder's affirmative control of corporate actions, not where there is no such involvement or control by the controlling shareholder.

█ Furthermore, in *County Green*, the fiduciary duty of good faith and fair dealing was stated as requiring that:

> each transaction entered into by the corporation through its officers and directors . . . be entered into in good faith. In most all instances, good faith requires an intent to benefit the corporation.

*Id.* There is nothing in the record in this case that supports a finding that the transaction at issue, the ECC loan, was entered into in anything other than good faith with an intent to benefit the corporation. Clearly, Hughes and Guy O'Hazza initially believed that the hotel project would be mutually beneficial to the corporation and to ECC. The failure of the project to materialize was not due to any actions of the parties but because the hotel management decided not to go through with it.

█ Finally, the record does not show that ECC was the victim of fraud, of any type, perpetrated by the O'Hazzas or by anyone else. Hughes had been involved with the corporation on at least 10 previous deals. The O'Hazzas had not been involved in any of those transactions. Hughes knew the financial situation of the corporation prior to advancing Guy O'Hazza the money for the hotel project. Hughes was a voluntary creditor who had the knowledge and opportunity to investigate the corporation before he agreed to loan the funds. We agree with the O'Hazzas' position that ECC "knowingly made a risky loan to a corporation on shaky financial footing with the hope of making a profit."

██ Neither the record, nor the case law relied upon by the trial court and by ECC, supports the trial court's holding that the O'Hazzas breached a fiduciary duty to the corporation and to its creditors through their actions generally, or with regard to the transaction giving rise to the debt owed ECC.

In summary, we find that the trial court clearly erred in holding that the corporation was the alter ego and instrumentality of the O'Hazzas and in disregarding the corporate entity and imposing personal liability for the debt of the corporation on the O'Hazzas. Accordingly, we will reverse the judgment of the trial court and enter final judgment for the O'Hazzas.

*Reversed and final judgment.*