Present:  All the Justices

JEROME GREENBERG

v. Record No.  971472  OPINION BY JUSTICE CYNTHIA D. KINSER
                                          April 17, 1998
COMMONWEALTH OF VIRGINIA, EX REL.
ATTORNEY GENERAL OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Theodore J. Markow, Judge


In this case, the Commonwealth of Virginia seeks restitution from Jerome Greenberg, chairman of the board and majority shareholder of Allstate Express Check Cashing, Inc. (Allstate), of all amounts Allstate received from borrowers in connection with its cash advancement loan program in violation of the Consumer Finance Act (CFA). The Commonwealth proceeded on two theories under which to hold Greenberg personally liable:  (1) actively participating in the commission of the illegal conduct; and (2) piercing the corporate veil.  The trial court refused to pierce the corporate veil but held Greenberg personally liable by applying an active participation theory.  Because we find that Code § 6.1-308(B) precludes imposition of restitution on any entity or individual other than the lender, we will reverse the trial court's judgment imposing liability on Greenberg.  However, we find, as a matter of law, that the evidence is insufficient to pierce the

corporate veil and will affirm the trial court's judgment on that issue.

We will discuss each theory relied upon by the Commonwealth and the relevant facts seriatim.

## I. ACTIVE PARTICIPATION

### A. Facts

From February 10, 1992, until approximately February 1, 1993, Allstate, a Virginia corporation doing business as Allstate Express Checking, operated a check cashing/cash advance business from four different locations in Hampton, Norfolk, and Virginia Beach. Allstate provided two basic services to its customers. One service involved cashing government, payroll, travelers, insurance, and personal checks for individuals without checking accounts. Allstate's fees for this service started at 2% and varied depending on the type of check. Only a small percentage of Allstate's customers utilized this service.

The second service that Allstate offered was for customers with a checking account and involved advancing cash against present-dated checks at a discount from the face amount of the checks and holding the checks for a specified period of time before cashing them. The fee Allstate charged for this service was a fixed percentage of the amount advanced, such as 25% or 30%, depending on the

2

amount of the advancement.  The majority of Allstate's customers used this service.

The three major principals in Allstate were Greenberg, Loran S. Martin, and Joseph P. Lynch.  They comprised Allstate's board of directors, with Greenberg serving as the chairman.  Martin was Allstate's president and chief operations officer, and Lynch was Allstate's secretary and treasurer.  All three were also shareholders of Allstate, with Greenberg being the majority shareholder.

In early 1993, the Commonwealth brought suit against Allstate alleging that it had violated the CFA by making loans in amounts and at interest rates prohibited under Code § 6.1-249.[1]  In that suit, the Circuit Court of the City of Richmond determined that Allstate's cash advance services constituted "loans" within the meaning of the CFA

---

[1] The version of Code § 6.1-249 in effect in 1993 provided in pertinent part:

> No person shall engage in the business of lending in amounts of the then established size of loan ceiling or less, and charge, contract for, or receive, directly or indirectly, on or in connection with any loan, any interest, charges, compensation, consideration or expense which in the aggregate are greater than the rate otherwise permitted by law except as provided in and authorized by this chapter and without first having obtained a license from the Commission.

The General Assembly amended this section in 1995.

and that Allstate's fees for these services exceeded the CFA's statutory limits.  Accordingly, the trial court enjoined Allstate from violating the CFA and entered judgment for the Commonwealth, "as trustee for the use and benefit of affected borrowers," against Allstate "for restitution of all amounts it received from borrowers in connection with its check advancement loan program."

On January 5, 1994, the Commonwealth filed a bill of complaint against Greenberg and alleged, inter alia, that Greenberg actively participated in the illegal acts perpetrated by Allstate.[2]  The Commonwealth sought to hold Greenberg individually liable for restitution to borrowers under Code § 6.1-308(B).

The trial court found that Greenberg did actively participate in Allstate's illegal conduct and that the Commonwealth could, therefore, obtain restitution from Greenberg for the benefit of Allstate's borrowers.  In doing so, the court rejected Greenberg's argument that Code § 6.1-308(B) allows for restitution only from the "lender" for violations of the CFA.  Rather, in a letter opinion, the court reasoned:

_____

[2] The Commonwealth also included Martin and Lynch in its suit.  However, the claims against them were resolved and are not before this Court.

4

> The liability has been imposed against the corporation, according to the statute, as a result of the illegal acts of the corporation. Because it was actually individuals who committed the illegal acts, the individuals can be held responsible. Mr. Greenberg is to be held personally liable, not because he was the "lender", but because he was a responsible actor within the corporation which was the "lender." The statute imposes the liability on the corporation as lender and the doctrine of active participation extends that liability to the individuals involved.

Subsequently, in an order dated April 15, 1997, the trial court entered a permanent injunction against Greenberg and final judgment in favor of the Commonwealth in the amount of $237,154, as restitution in trust and for the benefit of Allstate's borrowers, and $30,000 as attorney's fees. Greenberg appeals.

## B. Analysis

Code § 6.1-303(A)(2) of the CFA provides that "[t]he Attorney General may seek and the circuit court may order or decree such other relief allowed by law, including restitution to the extent available to borrowers under subsection B of § 6.1-308." Code § 6.1-308 sets forth the penalties for CFA violations and provides as follows:

> A. Any person and the several members, officers, directors, agents, and employees thereof, who violate or participate in the violation of any provision of § 6.1-249 shall be guilty of a Class 2 misdemeanor.

> B. Any contract of loan in the making or collection of which any act has been done which violates § 6.1-249 shall be void and the lender shall not collect, receive, or retain any principal,

5

interest, or charges whatsoever, and any amount paid on account of principal or interest on any such loan shall be recoverable by the person by or for whom payment was made.

This Court has stated that "[a] corporation can act alone through its officers and agents, and where the business itself involves a violation of the law, the correct rule is that all who participate in it are liable." Crall and Ostrander v. Commonwealth, 103 Va. 855, 859, 49 S.E. 638, 640 (1905). See also Bourgeois v. Commonwealth, 217 Va. 268, 274, 227 S.E.2d 714, 718 (1976). Relying on these cases, the Commonwealth argues that Greenberg is personally liable for Allstate's violations of the CFA. Greenberg, however, contends that the trial court erred in using the active participation theory to hold him personally liable because Code § 6.1-308(B) precludes the imposition of restitution on any individual or entity other than the lender.

A resolution of this issue necessarily requires us to examine Code § 6.1-308(B). At the outset, we note that the CFA is a remedial statute. Valley Acceptance Corp. v. Glasby, 230 Va. 422, 428, 337 S.E.2d 291, 295 (1985). Consequently, we construe it liberally so as "to avoid the mischief at which it is directed and to advance the remedy for which it was promulgated." Id. In doing so, we

6

cannot, however, deviate from the language of Code § 6.1-308, which we find to be plain and unambiguous.

Our duty is "to construe the law as it is written." Hampton Roads Sanitation Dist. Comm'n v. Chesapeake, 218 Va. 696, 702, 240 S.E.2d 819, 823 (1978). We assume that "the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words . . . ." Barr v. Town & Country Properties, Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990). "To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret." Faulkner v. Town of South Boston, 141 Va. 517, 524, 127 S.E. 380, 382 (1925).

We agree with Greenberg that Code § 6.1-308(B) permits a recovery of restitution only from the lender. In Code § 6.1-308(A), the General Assembly prescribed misdemeanor criminal liability for "[a]ny person and the several members, officers, directors, agents, and employees thereof." The CFA defines "person" to include "individuals, copartnerships, associations, trusts, corporations, and all other legal and commercial entities." Code § 6.1-245. Thus, "individuals, . . . corporations, and all other legal . . . entities" and their "members, officers, directors, agents, and employees" are subject to

7

misdemeanor penalties for violating the CFA. The General Assembly explicitly created a broad category of individuals and entities subject to Code § 6.1-308(A).

In contrast to subsection (A), Code § 6.1-308(B), provides that only the "<u>lender</u> shall not collect, receive, or retain any principal, interest, or charges whatsoever, and any amount paid on account of principal or interest on any such loan shall be recoverable by the person by or for whom payment was made." (Emphasis added). Absent from subsection (B) is the broad category of entities found in subsection (A). In other words, subsection (B) does not include any individual, officer, director, or entity other than the lender.

"When the General Assembly uses two different terms in the same act, it is presumed to mean two different things." <u>Forst v. Rockingham Poultry Mktg. Coop. Inc.</u>, 222 Va. 270, 278, 279 S.E.2d 400, 404 (1981). As evident in subsection (A), the General Assembly knew how to broaden the range of liability, and the absence of any such provisions in subsection (B) indicates the General Assembly's intent to limit those from whom borrowers may obtain restitution. To determine otherwise would be to rewrite the statute and to contradict the General Assembly's express intent. Thus, we hold that the trial court erred in using the active

participation theory to allow the Commonwealth to recover restitution from Greenberg for Allstate's violations of the CFA.

Our decision is not inconsistent with other cases in which we used the active participation theory to impose individual liability on corporate officers or directors. The distinction between such cases and the present one lies in the language of the relevant statutes. For example, in Bourgeois, a corporate officer was found guilty of grand larceny by obtaining money by false pretenses. The statute at issue provided that "[i]f any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof; . . . ." Bourgeois, 217 Va. at 269 n.1, 227 S.E.2d at 715 n.1. (Emphasis added). Likewise, in Crall, the corporation's vice-president was criminally liable under a statute which provided "[a]ny peddler who shall peddle for sale, or sell or barter, without a license, shall pay a fine . . . ." Crall, 103 Va. at 858, 49 S.E. at 639. The statute defined "peddler" as "[a]ny person who shall carry from place to place any goods, wares or merchandise, and offer to sell or barter the same, or actually sells or

barters the same . . . ." Id. at 857, 49 S.E. at 639. (Emphasis added).

In contrast to the above two statutes, Code § 6.1-308(B) permits a recovery of restitution solely from the "lender" and does not impose liability on "any person." Therefore, to allow the Commonwealth to obtain restitution from Greenberg would be to invade the province of the legislature and to expand the scope of liability in Code § 6.1-308(B).[3]

## II. PIERCING THE CORPORATE VEIL

### A. Facts

Greenberg first became involved in Allstate prior to its incorporation[4] when Martin and Lynch gave Greenberg a business prospectus and asked him to provide the initial capitalization for Allstate.[5] After consulting about the proposed business venture with his attorney, who did not

_____

[3] The Commonwealth summarily argued in its brief that, under Code § 6.1-303(A)(1), the Attorney General may sue "any person" who has violated the CFA for monetary relief. However, the Commonwealth did not bring this suit under Code § 6.1-303(A)(1). Rather, it asked to be trustee for the benefit of the borrowers under Code § 6.1-303(A)(2). Therefore, we will not address this argument.

[4] Allstate was incorporated on January 22, 1992.

[5] Lynch, a CPA, had prepared the prospectus. Martin had experience working in another check cashing/cash advance company.

10

advise Greenberg of any potential legal problems, Greenberg agreed to loan $60,000 to Allstate interest-free with the understanding that Allstate would repay Greenberg in full within six months.[6]

Martin, Lynch, and Greenberg each had different responsibilities in regard to Allstate's business. Martin's responsibilities included developing Allstate's fee schedules, managing personnel, screening customers, and advertising. Lynch handled all the bookkeeping, accounting, and record-keeping functions. Greenberg was Allstate's financial consultant for which he received $500 a week as compensation. As the financial consultant, Greenberg addressed start-up and expansion problems and kept "tabs on what [Martin and Lynch] were doing to protect his investment."

However, unlike Martin and Lynch, Greenberg, according to Martin, did not participate in the daily operations of Allstate in any substantial way. Greenberg occasionally visited the four stores, and an Allstate employee testified

---

[6] During the course of Allstate's business, Greenberg actually loaned more than $60,000 to Allstate. When it became apparent that Allstate could not repay Greenberg during the first six months of its operation, Allstate began paying interest to him at a rate of 4% per month, which was later increased to 5% after other individuals made similar investments in Allstate and received the higher interest rate.

that during one such visit, Greenberg instructed her not to use the terms "loan," "interest," and "advance" when speaking to customers.[7]  At times, Greenberg would also make bank deposits for Allstate and transfer cash between offices.  However, these activities were not part of his regular responsibilities and were considered a "rare event."  Greenberg did attend meetings of the directors and, occasionally, those of the managers.  However, his participation at the meetings with the managers was minimal, and he was considered a "spectator."

In late November or early December 1992, Greenberg learned that the Commonwealth had filed suits alleging violations of the CFA by other companies similar to Allstate.  After discovering that other "cash-advance" companies had, in response to the suits, initiated a "gift certificate catalogue business," Greenberg, Martin, and Lynch concluded that Allstate should do the same.[8]  At this

_____

[7] Martin testified that Greenberg's attorney had advised against using these terms to avoid the implication that Allstate was a licensed lending institution.

[8] Prior to making this change, Greenberg consulted with his attorney to ascertain if the gift certificate program posed any legal problems or issues.  Greenberg's attorney assured him that the program was "perfectly fine."  However, a former Allstate employee did testify that Martin referred to the gift certificates as a "front."
Under the gift certificate program, Allstate gave its customers a gift certificate in the amount of Allstate's

point, however, Greenberg decided that he "want[ed] to get out of the business" and asked for a return of his money.[9] Allstate then began "winding down" its business and paid its trade debts and withholding taxes.

After considering the testimony and exhibits, the trial court concluded that the evidence was insufficient to pierce the corporate veil. In its letter opinion, the court stated that the evidence failed to show "that Greenberg incorporated [Allstate] for the purpose of disguising his wrongful actions and evading liability."

## B. Analysis

In its assignment of cross-error, the Commonwealth argues that sufficient evidence exists to justify piercing the corporate veil to impose personal liability on Greenberg. The Commonwealth contends, and we agree, that the trial court's analysis focused only on Greenberg's intent in incorporating Allstate and failed to address his subsequent use of the corporation. Nevertheless, based upon our review of the record, we conclude that, as a

_____

fee. The customers could then use the certificates to offset the price of furniture that they bought at a furniture retail store owned by Greenberg.

[9] Allstate's bank records show that Greenberg received a total of $183,163.04 from Allstate. Of that amount, $126,462.01 was paid between November 25, 1992 and February 19, 1993.

matter of law, the evidence is insufficient to disregard the corporate structure and impose personal liability on Greenberg.

We have recognized that "no single rule or criterion . . . can be applied to determine whether piercing the corporate veil is justified." O'Hazza v. Executive Credit Corp., 246 Va. 111, 115, 431 S.E.2d 318, 320 (1993). Disregarding the corporate entity is usually warranted if:

> [T]he shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage. . . . Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice.

Id., 431 S.E.2d at 320-21. Ultimately, a decision whether to disregard the corporate structure to impose personal liability is a fact-specific determination, and each case requires a close examination of the factual circumstances surrounding the corporation and the questioned acts. Id., 431 S.E.2d at 321.

Only "an extraordinary exception" will justify disregarding the corporate entity, and no such exception is present here. Cheatle v. Rudd's Swimming Pool Supply Co., Inc., 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987) (quoting Beale v. Kappa Alpha Order and Kappa Alpha Alumni Found.,

14

192 Va. 382, 397, 64 S.E.2d 789, 797 (1951)). The evidence showed that Greenberg did not develop Allstate's policy or procedure; rather, Martin and Lynch approached Greenberg with a business plan detailing Allstate's operation. Further, Greenberg, before becoming Allstate's majority shareholder, sought advice from his counsel regarding the legality of the proposed business. Thus, the trial court correctly concluded that Greenberg did not incorporate Allstate for the purpose of disguising wrongful actions or concealing a crime.

Nor did Greenberg use the company to "evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." O'Hazza, 246 Va. at 115, 431 S.E.2d at 320. He did not determine the amount of or collect Allstate's fees, solicit customers, or handle employment matters. At most, as Allstate's financial consultant, he addressed start-up and expansion issues. When Greenberg instructed an employee not to use the words "loan" or "interest," he did so because of advice he had received from his attorney. He also sought legal advice before Allstate implemented the gift certificate program. Finally, in recouping his loan to Allstate, Greenberg received interest only after Allstate could not abide by its initial agreement to repay the loan in six

15

months and increased the amount of the interest only after other investors started receiving the higher rate. Thus, the evidence, as a matter of law, establishes that Greenberg, like any other shareholder, used the corporate structure to limit his liability to his initial investment and not to perpetrate or disguise illegal activities.[10] In other words, Greenberg did not use the corporate structure "to mask wrongs" or to facilitate the commission of illegal acts. Bogese, Inc. v. State Highway and Transp. Comm'r, 250 Va. 226, 231, 462 S.E.2d 345, 348 (1995).

Therefore, for the reasons stated, we will affirm in part and reverse in part the circuit court's judgment, and enter final judgment in favor of Greenberg.

Affirmed in part,
reversed in part,
and final judgment.

---

[10] The Commonwealth also claims that the trial court erred by failing to consider whether Allstate was the alter ego of Greenberg. Because we have determined, as a matter of law, that the evidence is insufficient to pierce the corporate veil, we do not address this argument.