COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Athey and Callins
Argued at Richmond, Virginia


SOUTHAMPTON QUARRY LLC

                                                  MEMORANDUM OPINION* BY
v.        Record No. 0256-24-2                    JUDGE CLIFFORD L. ATHEY, JR.
                                                         SEPTEMBER 2, 2025
BRIAN T. FORD, ET AL.


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                        Jacqueline S. McClenney, Judge

        Norman A. Thomas (Christopher J. Habenicht; Norman A. Thomas,
        PLLC; MeyerGoergen PC, on briefs), for appellant.

        William F. Seymour, IV (FloranceGordonBrown, P.C., on brief), for
        appellees.


        Southampton Quarry LLC ("Southampton Quarry") appeals the judgment of the Circuit

Court of the City of Richmond ("circuit court") recognizing and confirming the existence of a

prescriptive easement benefitting a dominant estate in land owned by Brian and Stephanie Ford

(collectively "the Fords") traversing over a pathway existing on a servient estate of land owned

by Southampton Quarry. Southampton Quarry assigns error to the circuit court for determining

that: 1) the Fords proved by clear and convincing evidence the existence of a prescriptive

easement on Southampton Quarry's land; 2) the Fords proved by clear and convincing evidence

that their predecessors' use of any existing pathway was continuous and adverse; and 3) the

Fords proved by clear and convincing evidence that they and their predecessors in title had

established a prescriptive easement across Southampton Quarry's land to Riverside Drive. For

the following reasons, we reverse.

_____
        * This opinion is not designated for publication. *See* Code § 17.1-413(A).

# I. Background[1]

On February 14, 2022, the Fords filed suit in the circuit court against their adjacent landowner Southampton Quarry, praying for the establishment of a boundary line between the parcels pursuant to Code § 8.01-179 and for the circuit court to recognize and establish the location of an easement by implication benefitting the Fords' parcels thereby permitting the Fords and their successors in title the right to ingress and egress over Southampton Quarry's parcel at a location bordering Riverside Drive. The Fords also pleaded in the alternative that the circuit court recognize and establish the location of an easement by prescription benefitting the Fords' parcels that would permit the Fords and their successors in title the right to ingress and egress over Southampton Quarry's parcel at the same location bordering Riverside Drive.[2] Attached to the complaint as Exhibit A, and reproduced herein for ease of reference, was "a plat of survey made by Balzer & Associates, Inc." of the Fords' two parcels of land located in the City of Richmond and further illustrating the location of the various parcels, landmarks, and roadway referenced by the parties in their briefs.

---

[1] This Court views "the evidence in the light most favorable to [the Fords], the prevailing part[ies] at trial." *Johnson v. DeBusk Farm, Inc.*, 272 Va. 726, 728 (2006).

[2] The circuit court's determination regarding the establishment of a boundary line between the parcels and the existence of an easement by implication were not appealed and thus are not at issue in this appeal.



The Fords alleged in their complaint that they had previously acquired Parcels A and B from James Starnes ("Starnes") and his wife on March 23, 2021. The Fords further alleged that a parcel bordering Parcel A at the time they purchased Parcels A and B from Starnes was owned by Southampton Quarry. Southampton Quarry had previously been a corporation as early as January of 1950 when it first acquired its property from James and Rosalie Ball (collectively "the Balls"), who had previously owned Parcels A and B as well as the adjacent parcel over which the Fords now claim an easement by prescription. On September 10, 2019, Starnes, then president of Southampton Quarry Inc., converted the existing corporation to its current form of incorporation as a limited liability company.[3] The Fords also attached to the complaint a "plat of

---

[3] The dissent is correct that neither Starnes nor Mathew Rigby testified at trial that they were managers of Southampton Quarry, but Starnes did sign his name on the conversion document as "President" of Southampton Quarry, Inc., and a copy of this conversion document was attached to the Fords' complaint as Exhibit D.

survey made by McKnight & Associates, P.C." from May 16, 1998, which is also included herein for ease of reference.



In paragraph 11 of the Fords' complaint, they further alleged that a

> four-foot-wide path (the "River Path") extends from Parcel A of
> the Ford Property to Riverside Drive where Riverside Drive
> adjoins Parcel B of the Ford Property, crossing back and forth from
> Parcel A of the Ford Property to and from the Southampton Quarry
> Property as the path meanders down to Riverside Drive and Parcel
> B. The River Path is marked on the McKnight Plat.

In addition, the Fords alleged that the River Path had been used since 1925 "for ingress and egress to and from Parcel B and the James River." Specifically, in Count III of the complaint, the Fords alleged that "there was and has been an existing use of the River Path by the Fords and their predecessors in title to access Parcel B and the James River that is adverse to the ownership

rights of [Southampton Quarry]." In its answer filed on March 16, 2022, Southampton Quarry "denie[d] that the 'River Path' alleged by the Fords ever existed." Even if such path existed, Southampton Quarry denied that "the use of it by the previous owners of the Fords' property was exclusive and/or adverse."

On September 13, 2023, the Fords filed a pre-trial memorandum. In it, they noted that "[t]he 'River Path' down the hill, which crosses back and forth between the Ford and Southampton Quarry [p]roperties . . . is referenced by the Fords in their [c]omplaint as the 'River Path.'" They argued that because Starnes "never possessed legal control" over Southampton Quarry and because it was a "separate and distinct" legal entity, Starnes could not have given himself or his family members permission to use the path.

The circuit court subsequently held a two-day bench trial beginning on September 19, 2023. During the Fords' case in chief, Brian Ford ("Brian") testified that when they first visited their future home at 7612 Hill Drive in January of 2021, their realtor, Paul Wierschem ("Wierschem"), showed the Fords both "the path" and "the gate" accessing Riverside Drive. The Fords subsequently purchased their home in March of 2021. Brian further testified that there was a combination lock barring ingress and egress through the gate but that he was given the combination to the lock by Mathew Rigby ("Rigby") and was never told by Rigby that he couldn't use "the path and go to the gate and go up the hill."

James McKnight testified that he performed a survey of the Fords' property in 1998. He testified that after the Fords purchased their home, he was employed by them to determine their boundary line with Southampton Quarry's property. In doing so, he added some "paths and trails" to his original 1998 survey.[4] He further testified to the accuracy of a 1949 plat, which

---

[4] These trails are indicated in the McKnight plat by two arrows that point to two curved dotted lines, with the caption "Existing foot trails (4 ft wide)."

reflected the properties at issue before they were subdivided by the Balls. The 1949 plat is also

included herein for ease of reference.



Next, Wierschem testified that he "advised the Fords that the Starnes used the pathway

and that they had use of the gate to go across Riverside Drive and that they could come and go

through that gate as they please[d]." Dustin Wooten ("Wooten") also testified during the Fords'

case in chief that he had performed landscape work for approximately ten years during the time

the Starnes owned the Fords' property. He stated that there was a "double gate with a

combination lock on it" in the "grassy area." He further testified that he had knowledge of

"Mr. and Mrs. Starnes and their four children using the path from time to time" to "walk down to

the quarry." Additionally, he testified that he was given permission from the Starnes for him and

"a buddy" to "use the path" to kayak and fish in the quarry lake.

Scott Ellett ("Ellett") next testified that he lived a few lots over from 7612 Hill Drive and

that in 1963, his parents "bought the house that [he] live[s] in currently." He testified that when

his family moved into the neighborhood, "the Southampton Quarry was a swim club that was a membership organization mostly of people who lived in the neighborhood." Ellett claimed membership in the swim club, testifying that he swam there "from time to time" in the summer. He further claimed that his family had the right to swim in the quarry only because they owned stock in Southampton Quarry.

Starnes testified that he purchased the property at 7612 Hill Drive in 1998 and lived there with his wife and four children. He testified as to the existence of a pathway "from the top of the hill . . . running down to the bottom of the hill" at the time he purchased the property. He stated that he had access to the gate at the bottom of the hill and "when we lost the keys, we had bolt cutters and could put a new lock on it." He testified that his wife and children also used the path. He also acknowledged that when he purchased the property in 1998, he received "one third of the outstanding stock in Southampton Quarry" from the previous owner.

When asked on cross-examination what the "business" of Southampton Quarry was, Starnes replied that Southampton Quarry "had no business" other than "to maintain the quarry for the owners or the stockholders or members and their families." When asked if Starnes's family "was using the quarry because [Starnes] gave them permission to do that as a stockholder and then a member," Starnes answered, "We never formally gave ourselves permission but yes, we had permission." Starnes was asked again if his "occupancy on that [property] was with the permission of that corporation and then that LLC," to which Starnes replied, "Yeah."[5]

Three additional witnesses described possible designs, costs, and challenges associated with building an alternative path down the Fords' property to access Riverside Drive. The Fords

---

[5] After this, Starnes was asked, "Even if it was implied?" and Starnes responded, "Right." As this exchange is quoting from the trial transcript directly, we reject the dissent's contention that we are "mischaracteriz[ing]" Starnes's testimony, when we are only describing it as it appears in the record before us. *Infra* at 19.

rested their case. Southampton Quarry moved to strike the Fords' case, asserting that Starnes's use of the property was not adverse because Starnes "was a stockholder first and then a member in Southampton Quarry, LLC, and that the purpose of that LLC was to own and maintain the property for the use and enjoyment of the members and their families." Southampton Quarry also argued that the Fords had not carried their burden regarding the definiteness of any potential prescriptive easement, noting that a path down the hill had been established but that they had not "establish[ed] that there was an apparent path across . . . the bottom part of the quarry." Regarding the potential adverse use of the path, the Fords responded that because "the corporation or limited liability company is certainly a separate and distinct entity from the shareholders and directors," it did not matter if Starnes "perceived that he had permission or not, or whatever his rights were." The Fords conceded that "someone who owns two-thirds could . . . veto whatever [the one-third owner] wanted to do." As to where the easement would go once reaching the bottom of the hill, the Fords replied that the path would go "to the gate . . . [in] a direct line between where the path ends until you get to the gate."

In rebutting the Fords' arguments, Southampton Quarry responded that if the circuit court took the Fords' argument "to its logical extreme," a person who had placed their family home into an LLC owned in two equal shares with their spouse would not be able to access their home because they were not a majority shareholder. The circuit court denied Southampton Quarry's motion to strike, stating that it did so "[w]ith all inferences flowing to the plaintiff." Southampton Quarry objected to the circuit court's ruling and called Rigby as its first witness.

Rigby testified that he purchased the property at 7701 Riverside Drive in October of 2017 and simultaneously received stock in Southampton Quarry from the prior owner. He noted that Starnes was the only other stockholder at that time. He noted that the purpose of Southampton Quarry was "to own real estate and to be a recreational property for the enjoyment of members

of the corporation and their families." He clarified that the "business remain[ed] the same after [Southampton Quarry] was converted from a corporation to an LLC." He agreed that the corporation was converted into a limited liability company in 2019 and that he had purchased Starnes's shares at that time. He testified that when Starnes "originally bought [his] interest, and [they] owned it together, [they] both had the right to use it." Rigby claimed that the quarry property was in "really bad condition" and that once he purchased his home in 2017 he "beg[a]n to maintain and fix the quarry property." Rigby also identified a document labeled "Interest Purchase Agreement," which he testified was agreed upon between him and Starnes to purchase Starnes's one-third share of Southampton Quarry. Rigby maintained on cross-examination that he gave the Fords the combination to the gate for some "tree work" the Fords had wanted to do on their property.

After the Fords' rebuttal case,[6] Southampton Quarry renewed its motion to strike the Fords' case. Southampton Quarry reiterated the fact that Starnes had permission to use the property, rendering the use of the property as not adverse. The Fords responded that Rigby "always had legal control" over Southampton Quarry. Southampton Quarry countered that it was "not a question of control" over a legal entity and that such issues were a "red herring." The circuit court took Southampton Quarry's renewed motion to strike under advisement and granted leave for the Fords to file a post-trial memorandum by October 6, 2023, and for Southampton Quarry to file its post-trial memorandum by October 18, 2023.

As to the element of hostility, the Fords reiterated in their post-trial memorandum the same arguments they posited in their pre-trial memorandum, contending that Starnes's use of the quarry property was hostile to Southampton Quarry because Starnes "had no legal authority to make decisions on behalf of [Southampton Quarry]." In its response, Southampton Quarry

---

[6] The Fords' rebuttal case addressed other counts not at issue in this opinion.

argued that based on the trial testimony of Starnes, Rigby, and Ellett, if a person was a member of Southampton Quarry, they had permission to use the Southampton Quarry property. In a reply brief, the Fords claimed that Southampton Quarry had failed to properly rebut the presumption that the Fords'—and their predecessors in title's—use of the property was hostile.

The circuit court held in its final order that the Fords had established a prescriptive easement because Southampton Quarry failed to rebut the presumption that the Fords' use of the property was adverse. The circuit court noted that the Southampton Quarry corporation "had been established and existed to maintain the Southampton Quarry [p]roperty 'for the use and enjoyment of the members and their families.'" But the circuit court found that there was no evidence in the record that the purpose of Southampton Quarry—after it was converted into an LLC in 2019—was still the same. Referring to both forms of Southampton Quarry, the circuit court maintained that because Starnes "never possessed legal control over either entity" and corporations and limited liability companies are "separate and distinct entities" in Virginia law, Starnes could not have used the Southampton Quarry property permissively. The circuit court overruled Southampton Quarry's renewed motion to strike and entered judgment for the Fords. Southampton Quarry appealed.

## II. ANALYSIS

### A. *Standard of Review*

"Issues of adverse possession and prescription present mixed questions of law, reviewed de novo, and fact, to which the reviewing court gives deference to the determination of the trial court." *Mulford v. Walnut Hill Farm Grp., LLC*, 282 Va. 98, 109 (2011) (quoting *Scott v. Burwell's Bay Improvement Ass'n*, 281 Va. 704, 709 (2011)). "As to purely factual determinations made by the trial court, we will not disturb those findings unless they are plainly wrong or without evidence to support them." *Wetlands Am. Tr., Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 160 (2016)

(quoting *Perel v. Brannan*, 267 Va. 691, 698 (2004)). "[T]he credibility of witnesses and the weight accorded their testimony are matters solely for the fact finder who has the opportunity of seeing and hearing the witnesses." *Aldridge v. Commonwealth*, 44 Va. App. 618, 639 (2004) (quoting *Collins v. Commonwealth*, 13 Va. App. 177, 179 (1991)).

B. *The Fords failed to show that they were entitled to a prescriptive easement.*

Southampton Quarry asserts that the "Starnes' use of the quarry property was not adverse at any time." It contends that because Starnes was a shareholder in Southampton Quarry, and later a manager of the LLC, he and his family always had permission to use the Southampton Quarry property. We agree.

"In Virginia and elsewhere generally it may be said that the law is jealous of a claim to an easement, and the burden is on the party asserting such a claim to prove its elements clearly." *Eagle Lodge, Inc. v. Hofmeyer*, 193 Va. 864, 877 (1952).

> The claimant of a prescriptive easement . . . must prove by clear and convincing evidence that "the claimant's use of the [property] in question was adverse, under a claim of right, exclusive, continuous, uninterrupted, and with the knowledge and acquiescence of the owner of the land over which it passes, and that the use has continued for at least 20 years."

*Amstutz v. Everett Jones Lumber Corp.*, 268 Va. 551, 559 (2004) (quoting *Martin v. Moore*, 263 Va. 640, 645 (2002)). "[H]ostile possession [i]s possession 'under a claim of right and adverse to the right of the true owner.'" *Quatannens v. Tyrrell*, 268 Va. 360, 372 (2004) (quoting *Grappo v. Blanks*, 241 Va. 58, 62 (1991)). "If possession is hostile, the legal owner and the possessor cannot simultaneously exercise control over the land. Thus, permission negates hostile possession." *Quatannens*, 268 Va. at 372.

"It has been repeatedly held that the use of the land of another for any length of time, merely by permission, will not ripen into title." *Horn v. Webb*, 302 Va. 70, 79 (2023) (quoting *Rives v. Gooch*, 157 Va. 661, 668 (1932)). "If it be fairly shown that the use is permissive in its

- 11 -

inception, it will never by mere lapse of time ripen into a hostile right." *Martin v. Proctor*, 227

Va. 61, 65 (1984) (quoting *Wall v. Landman*, 152 Va. 889, 895 (1929)). "And having begun by

permission, [the use] will . . . continue to be regarded as permissive, especially when the latter's

use of the easement is in common with its use by others." *Witt v. Creasey*, 117 Va. 872, 876

(1915).

> Importantly, however, where the use by the claimant was "open,
> visible, and continuous throughout the required prescriptive
> period," the claimant is entitled "to a presumption that the use
> arose adversely or under a claim of right." *Once the presumption
> is established*, the burden then shifts to the owner of the servient
> estate to show that the "use was permissive, and not under claim of
> right."

*Boxley v. Crouse*, 79 Va. App. 350, 357-58 (2023) (emphasis added) (first quoting *Hafner v.*

*Hansen*, 279 Va. 558, 563 (2010); and then quoting *Johnson v. DeBusk Farm, Inc.*, 272 Va 726,

730 (2006)).

Here, testimony at trial established that the Balls formerly owned all the property at issue

in this case. In January of 1950, the Balls subdivided the property into parcels for their own use

and for sale to residential purchasers, creating a separate parcel that included the quarry itself and

conveying it to Southampton Quarry, Inc. Uncontroverted testimony adduced during both

parties' cases showed that the purpose of Southampton Quarry as early as 1963 was to maintain

the quarry property for "the owners or the stockholders or members and their families." Ellett

testified that Southampton Quarry was a swim club that Ellett and his family had the right to use

because they owned stock in Southampton Quarry. Starnes also testified during the Fords' case

in chief that his use of the Southampton Quarry property, which he purchased in 1998, was with

the permission of the corporation in which he also owned stock, as well as the subsequent limited

liability company, of which he was a member. Wooten testified that he observed the entire

Starnes family traverse the path to access the quarry and that Wooten and a friend were

- 12 -

personally given permission from Starnes to "use the path" to kayak and fish in the quarry lake. The Fords never presented any testimony that contradicted these facts. *See Rives*, 157 Va. at 667 (holding that use was presumed to be permissive because "uncontradicted" witness testimony established that the use was permissive).

The aforementioned witnesses, all of whom were called by the Fords during their case in chief, were in agreement with Rigby's later testimony on behalf of Southampton Quarry. Rigby's testimony was that the purpose of Southampton Quarry was to be a "recreational property for the enjoyment of members of the corporation and their families" and that this permissive use continued even after the entity was converted to an LLC. When the Fords put on their rebuttal case, they did not present any evidence that contradicted this. The Fords' own evidence confirmed that stockholders and members, along with their families, were permitted to access the quarry property using the path. Thus, the Fords failed to establish any presumption of hostility to support the claim that their allegedly prescriptive use originated adversely.

*Boxley* does not demand a different result. The *Boxley* court held that because the appellee had "presented evidence that their use of [the prescriptive easement] was open, visible, and continuous from at least 1995 to 2020—a period of 25 years," they "were entitled to the presumption that their use 'arose adversely or under a claim of right.'" *Boxley*, 79 Va. App. at 358. Thus, we held that "the burden then shifted to [appellant] to put forward affirmative evidence that the [appellee's] use arose out of permission." *Id.* at 358-59. Because the only evidence of permission was that the appellant had "mailed [appellee] a key to a gate that was never locked," the *Boxley* court found that this circumstantial evidence was not sufficient to rebut the presumption of hostility. *Id.* at 359. Here, rather than establishing a presumption of adverse use, the Fords' evidence instead showed that the use of the Southampton Quarry property by its stockholders was "permissive in its inception." *Wall*, 152 Va. at 895; *see Martin*,

227 Va. at 66-67 (holding that a prescriptive easement did not exist because "the use was permissive in its inception" and "there was no evidence of any 'decisive act'" that indicated an "adverse and hostile claim").  Because the Fords rely on Starnes's status as a predecessor in title and Starnes himself testified that he had permission, the Fords' own evidence failed to establish a presumption of hostility.  Thus, the circuit court's holding that Southampton Quarry "failed to rebut this presumption" was error because there is not sufficient testimony in the record justifying the presumption that the claim arose adversely or based upon any hostile act.[7]

Since the Fords failed to adduce testimony justifying a presumption that the use of the property was hostile, we must examine whether the record supports the element of hostility.  Based on the record before us, the uncontroverted testimony of multiple witnesses—two of whom were called by the Fords—established that since the 1960s, the status of being a stockholder in Southampton Quarry granted permission for the stockholder and their family to use the quarry property.[8]  Because Starnes was a stockholder and later a member of the subsequent limited liability company, he and his family had permission to use the quarry property.  And because Starnes and his family had permission to use the quarry property—which is inclusive of the area covered by the Fords' proposed prescriptive easement—it follows that their use of the property was not hostile to the rights of the owner.  Rigby additionally testified

_____

[7] The dissent would assume that the Fords established this presumption and place a burden on Southampton Quarry to show that the use was permissive.  But as noted herein, *Boxley* only allows this when the plaintiff presents initial evidence that shows a hostile use.  The Fords' evidence—for the period in which Starnes used the property—*only* established Starnes's permissive use.

[8] We agree with our dissenting colleague that "a shareholder's interest in a corporate entity does not imbue them with title . . . [or permission] to use the property of the entity as their own."  Rather, the evidence in this unique case shows that permission to use the Southampton Quarry swim club property—and by extension the path in question—was not only given to the stockholders of the corporation but their family members as well.  Our opinion does not categorically bar a stockholder from establishing a prescriptive easement against the corporation in which they own stock.

- 14 -

that the purpose of Southampton Quarry was also to be a "recreational property for the enjoyment of members of the corporation and their families" and that this use continued even when the entity was converted to an LLC. Contrary to the circuit court's conclusion that "there was no evidence" that Starnes believed he had permission to use the River Path, the Fords' own evidence as adduced through Ellett and Starnes established that stockholders of Southampton Quarry and their families had permission to use the quarry property and the River Path.

The Fords' evidence, combined with testimony from Rigby, demonstrates that the use of the Southampton Quarry property was permissive and therefore not hostile. Thus, a prescriptive easement did not exist during the time that Starnes owned the property. Since the Fords purchased their home in 2019 and they must rely on Starnes's use of the property as their predecessor in title to reach the required 20-year period, the circuit court erred in finding that a prescriptive easement existed over Southampton Quarry's property. Therefore, we reverse the judgment of the circuit court.[9]

### III. CONCLUSION

"In the face of positive evidence showing permission or license, presumption of a right, or grant, disappears. A prescriptive right will not arise from the permission of the owner." *Rives*, 157 Va. at 668. Because the Fords' evidence showed that the use of the River Path arose from permission, we reverse the judgment of the circuit court.

*Reversed and final judgment.*

---

[9] Because we find that the Fords failed to carry their burden to establish the element of hostility as to the "River Path," we do not reach the remainder of Southampton Quarry's assignments of error. "The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)).

Callins, J., dissenting.

Today the Court determines that a shareholder in a private, closely-held corporate entity cannot obtain an easement by prescription over land owned by the entity since, in my colleagues' view, the shareholder's use is permissive by virtue of their stock-holding status. In doing so, the majority weakens the protections offered by, and the economic principles underlying, the corporate veil. I cannot join this undertaking.[10]

This Court reviews de novo the ultimate legal question of whether the trial court could grant a prescriptive easement, but we review for evidentiary support the trial court's factual findings as to the individual elements. *See Boxley v. Crouse*, 79 Va. App. 350, 359 (2023). "As to purely factual determinations made by the trial court, we will not disturb those findings unless they are plainly wrong or without evidence to support them." *Wetlands Am. Tr., Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 160 (2016) (quoting *Perel v. Brannan*, 267 Va. 691, 698 (2004)). Assuming the Fords succeeded in establishing the "presumption that [their] use arose adversely or under a claim of right," *Hafner v. Hansen*, 279 Va. 558, 563 (2010), the issue before us is whether the trial court erred in finding that Southampton Quarry failed to carry its burden of production to show that the prescriptive use was permissive, *Rives v. Gooch*, 157 Va. 661, 663 (1932). As the majority recognizes, "[i]f it be fairly shown that the use is permissive in its inception, it will never by mere lapse of time ripen into a hostile right." *Eagle Lodge, Inc. v. Hofmeyer*, 193 Va. 864, 878 (1952) (quoting *Wall v. Landman*, 152 Va. 889, 895 (1929)).

---

[10] Respectfully, I take issue with many facets of my colleagues' decision today, including the application of the light by which we view the facts, the misinterpretation and misapplication of *Boxley v. Crouse*, 79 Va. App. 350 (2023), and the compounding errors created by the majority's blending of the burdens applicable to either party in this matter. Nonetheless, I confine my address to the narrow grounds laid out herein, focusing on what seems the heart of my colleagues' reasoning, and refrain from expounding further on the extent of my differences.

The majority suggests that merely holding shares in a corporation or units in an LLC is sufficient to establish a legal interest in the property of the corporation. But this holding is inconsistent with Virginia law. Indeed, "[t]he independent legal existence of a corporation is a basic component of corporate law and of the economic policy it supports." *O'Hazza v. Exec. Credit Corp.*, 246 Va. 111, 115 (1993); *see also 1924 Leonard Rd., LLC v. Van Roekel*, 272 Va. 543, 553 (2006) ("[An] LLC . . . is an entity separate from its members."). "[T]he proposition is elementary that a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it." *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 266 Va. 3, 9 (2003) (quoting *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 234 Va. 207, 212 (1987)). "Only 'an extraordinary exception' will justify disregarding the corporate entity." *Greenberg v. Commonwealth ex rel. Att'y Gen.*, 255 Va. 594, 604 (1998) (quoting *Cheatle*, 234 Va. at 212).

Thus, it necessarily follows that "[t]he stockholders of a corporation have no legal title to property which is owned by the entity known as the 'corporation.'" *Mut. Transfer Corp. v. Commonwealth*, 172 Va. 622, 627 (1939) (quoting 13 Am. Juris. § 411). "When an LLC acquires an estate or a property interest, 'title to any estate or interest so acquired vests in the limited liability company,' not in its members." *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 30-31 (2019) (quoting Code § 13.1-1021); *see also* Code § 13.1-627(A)(4) (vesting corporations with the same powers as an individual to acquire legal title in property). This principle rings true regardless of the numerosity of shareholders or whether the corporate entity is public or private.[11] Relatedly, Virginia law delegates the power to control the business of a

---

[11] *See, e.g.*, *Erie Ins. Exch.*, 297 Va. at 30 ("[A] 'transfer of property from a member to the [LLC] is more than a change in form of ownership; it is a transfer from one entity or person to another.' . . . 'And this rule applies with equal force even though the LLC has only a single member.'" (second alteration in original) (first quoting *Hagan v. Adams Prop. Assocs.*, 253 Va. 217, 220 (1997); and then quoting 10 William R. Waddell & Lee A. Handford, *Virginia Practice Series: Business Entities* § 1:15 (2018))); *Bogese, Inc. v. State Highway & Transp. Comm'r*, 250 Va. 226, 227, 230-31 (1995) (holding that unity of ownership could not exist for two adjoining

corporate entity to the entity's board of directors or managers, and "*the board of directors must direct the business and govern the policy and plans of the corporation.*" *Sterling v. Tr. Co. of Norfolk*, 149 Va. 867, 879-80 (1928).

The law of the Commonwealth is clear: a shareholder's interest in a corporate entity does not imbue them with title—or, by extension, permission—to use the property of the entity as their own. The law resoundingly proclaims the contrary: that the entity enjoys property rights wholly distinct from its shareholders, and only the entity's board of directors or managers may make determinations as to how the entity's property may be used. *See id.* And here the record reflects that (1) neither James Starnes nor Matthew Rigby testified that they served as directors or managers for Southampton Quarry; (2) neither James nor Matthew testified that they held formal meetings of the board of directors of managers or made any decisions about the use of the Southampton Quarry property beyond its maintenance; (3) neither the articles of incorporation nor the bylaws of the former corporation of Southampton Quarry are in the record; (4) the articles of organization for the LLC do not include any provisions outlining the management of

---

plots of land owned by a corporation and partnership separately, even as the same four family members were the only shareholders and partners in the respective business entities); *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979) (rejecting argument that the only three stockholders in a corporation were the "actual owners of the business and all its assets, including [a] leasehold estate, good will, and the right to earn profits"); *Sterling v. Tr. Co. of Norfolk*, 149 Va. 867, 880 (1928) ("A deed of corporate property by a person who owns all the stock does not convey good title. Although one person owns a majority of the stock, or all of it, or all but two shares, he does not in consequence thereof acquire the right to act for the corporation, or as the corporation, independently of the directors." (quoting William W. Cook, *Cook on Corporations* § 709 (8th ed. 1923))); *Mount v. Radford Tr. Co.*, 93 Va. 427, 430 (1896) ("The corporation holds the title, legal or equitable, to the corporate property, and is, as a rule, the *only* proper party to sue for wrongful dealings with its property." (emphasis added)); *Tuscarora Marketplace Partners v. First Nat'l Bank*, 82 Va. App. 261, 276-77 (2024) (noting that member of LLC could not bind property of the LLC to a restrictive covenant because the LLC's interest in the property vests only in the LLC); *Jordan v. Commonwealth*, 36 Va. App. 270, 273-76 (2001) ("When placed in its ancient common law context, Code § 48-3 can only be understood to authorize prosecution of the person or entity that holds actual title to the property on which a nuisance continues.") (reversing trial court's conviction of two sole members of LLC for a public nuisance where the LLC held title to property where nuisance occurred).

Southampton Quarry, or the requisite procedures to make decisions regarding the use of its property; and (5) James affirmatively testified that Southampton Quarry "never formally gave [the Starnes] permission" to use its property.

To this latter point, my colleagues read James's testimony as stating that "his use of the Southampton Quarry property . . . was with the permission of the corporation in which he also owned stock." *See supra* at 12. But this mischaracterizes James's testimony. When asked whether he and his family had permission to use the Southampton Quarry property, James responded that they "never formally gave [them]selves permission." James only *believed* he and his family "had permission" insofar as the permission "was implied" by virtue of their status as shareholders. This distinction defeats the majority's theory that the record features definitive testimony establishing that James's use of the property was permissive.

The only evidence in the record as to any intention for the use of the Southampton Quarry property was Matthew Rigby's testimony that "the purpose of it was to own real estate and to be a recreational property for the enjoyment of members of the corporation and their families." But the Starnes' use of the Southampton Quarry property to access the gate for ingress and egress to another portion of their property went beyond the scope of this purpose and could no longer be subsumed as permissive under the purpose of the entity. Put differently, James Starnes was objectively not using the property as a "recreational property for the enjoyment of the corporation and their families"; he was using it for a personal benefit not shared by his fellow shareholders, and to their exclusion.

Although I agree that the status of a claimant for a prescriptive easement as a shareholder in the owner-corporate entity may be *circumstantial* evidence of permissive use, circumstantial evidence of permissive use, alone, will not suffice for a finding of permissive use. Our Supreme Court has "held that the owner of the servient estate may not rebut this [presumption of

- 19 -

adversity] by relying solely on circumstantial evidence." *Boxley*, 79 Va. App. at 358 (citing *Causey v. Lanigan*, 208 Va. 587 (1968)). Yet, my colleagues reason that James's status as shareholder combined with his possession of a lock for the gate—the origins of which are not elucidated by the record—suffices to establish that he operated with a permissive use. James's possession of the combination to a lock that he may have placed on the gate himself is merely "circumstantial evidence" of permissive use and is "not sufficient to rebut the presumption" of adversity. *Id.* at 359. Circumstantial evidence of a permissive use is, objectively, insufficient.

Because James held no legal title to Southampton Quarry's property, I conclude that his status as a stockholder, alone, does not render his use of the path permissive. And because the record includes only circumstantial evidence of a permissive use by James, I would hold that the trial court's finding that James's use was not permissive is not plainly wrong or without evidentiary support. Further, because I would hold that the evidence was sufficient for the trial court to conclude that James's use was not permissive, I would proceed to consider the remainder of Southampton Quarry's arguments. And, ultimately, I would affirm the judgment of the trial court.

As a result, I respectfully dissent.